# PIRIE *v.* CHICAGO TITLE AND TRUST COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 391. Argued January 18, 21, 1901. — Decided May 27, 1901.

Frank Brothers were adjudged bankrupts in February, 1899. For a long time prior to that Pirie & Co. had dealt with them, selling them merchandise. Within four months prior to the adjudication of bankruptcy Pirie & Co. received from them $1336.79, leaving a balance still due and unpaid of $3093.98. When this payment was made Frank Brothers were hopelessly insolvent to the knowledge of Frank Brothers, but Pirie & Co. and their agents had no knowledge of it, and had no reasonable cause to believe that the bankrupts, by such payment intended to give a preference, nor did they intend to do so. Pirie & Co. proved their claim against the estate, and received a dividend thereon, which they still hold.

The provisions in the Bankrupt Act of July 1, 1898, c. 541, § 60, that "a person shall be deemed to have given a preference if, being insolvent, he has procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors, of the same class," means that a transfer of property includes the giving or conveying anything of value, anything which has debt paying or debt securing power; and money is property.

If the person receiving such preference did not have cause to believe that it was intended, he may keep the property transferred, but, if it be only a partial discharge of his debt cannot prove the balance.

When the purpose of a prior law is continued, its words usually are, and an omission of the words imply an omission of the purpose.

The object of a bankrupt act is, so far as creditors are concerned, to secure equality of distribution, among all, of the property of the bankrupt.

Subdivision *c* of section 60 of the bankrupt act is applicable to the cases arising under subdivision *b*, and allows a set-off, which might not be otherwise allowed.

In proceedings in bankruptcy in the matter of Frank Brothers, bankrupts, in the District Court for the Northern District of Illinois, the appellants filed a claim for goods, wares and merchandise, sold and delivered to said bankrupt firm for the sum of $3093.98. The claim was allowed, and subsequently a dividend of fifteen per cent was paid thereon.

On the 31st of August, 1899, the appellee, the Chicago Title and Trust Company, filed a petition for a reconsideration of the claim and its rejection on the ground that Carson, Pirie, Scott & Company had within four months prior to the filing of the petition in bankruptcy received from the bankrupts large sums of money as preferences, which preferences had not been surrendered. The recovery of the dividend paid was also prayed for.

To the petition, Carson, Pirie, Scott & Company made the following answer:

"They admit that they have collected in the usual and ordinary course of their business, from said bankrupts, Frank Brothers, within four (4) months prior to the filing of the petition in bankruptcy, the sum of one thousand three hundred and thirty-six and $\frac{79}{100}$ dollars ($1336.79).

"Further answering, Carson, Pirie, Scott & Company say, that they did not know, or have reason to believe, that the said Frank Brothers were insolvent at the time the payments were made, nor did they have reasonable cause to believe that such payments were made with any intent to give them a preference, nor did said Frank Brothers intend the payments so made to be preferences."

The matter came up before Frank L. Wean, referee, and he substantially found the facts, from the stipulation of the parties, as hereinafter stated in the findings of the Circuit Court of Appeals, and that the payments constituted a preference. He adjudged therefore that the claim be reconsidered and rejected, and the dividend paid thereon be given up. On review the District Court also found the facts as the referee found them, and on the 9th of May, 1900, made and entered an order, the conclusion of which was as follows:

"It is therefore ordered, adjudged and decreed that said claim of said Carson, Pirie, Scott & Company, heretofore filed herein and allowed, should be reconsidered.

"That said claim of Carson, Pirie, Scott & Company should be rejected and expunged.

"That said Carson, Pirie, Scott & Company forthwith pay

to the trustee herein the amount of the dividend heretofore paid to them by the trustee herein, to wit, the sum of $464.10."

Carson & Company excepted, and subsequently took an appeal to the Circuit Court of Appeals, which court affirmed the order of the District Court, upon its opinion in *Columbus Electric Co.* v. *Worden, Trustee, In re Fort Wayne Electric Corporation*, 99 Fed. Rep. 400. The case was then brought here.

The findings and facts and conclusions of law of the Circuit Court of Appeals are as follows:

"*First.* That on February 11, 1899, August Frank, Joseph Frank and Louis Frank, trading as Frank Brothers, were duly adjudged bankrupts.

"*Second.* That for a long time prior thereto appellants carried on dealings with the said bankrupt firm—said dealings consisting of a sale by said appellants to said Frank Brothers of goods, wares and merchandise amounting to the total sum of $4403.77.

"*Third.* That said appellants in the regular and ordinary course of business, and within four months prior to the adjudication in bankruptcy herein, did collect and receive from said bankrupts as partial payment of said account for such goods, wares and merchandise so sold and delivered to said Frank Brothers, the sum of $1336.79, leaving a balance due, owing and unpaid, amounting to $3093.98.

"*Fourth.* That at the time this payment was made said Frank Brothers were wholly and hopelessly insolvent to the knowledge of said Frank Brothers, and that when said payments were made and at the time of the adjudication in bankruptcy of the bankrupts herein, the assets of said bankrupts did not exceed the sum of $125,000, while their liabilities exceeded $500,000.

"*Fifth.* That at the time of the payment above set forth neither said appellants nor any of their agents had knowledge of the insolvency of said Frank Brothers, or had reasonable cause to believe that said Frank Brothers were insolvent, and that when said payment was made said appellants did not have reasonable cause to believe that said bankrupts by said payment intended thereby to give a preference. Nor did said bankrupts by said payments intend thereby to give a preference.

"*Sixth.* That at or about the time of the first meeting of the creditors herein, to wit, on March 17, 1899, said appellants duly filed a claim herein against said bankrupts' estate for their balance of said claim for goods, wares and merchandise sold by them to the bankrupts, as aforesaid—said balance amounting to the sum of $3093.98, and that at or about the time of the said first meeting of creditors herein said claim was duly allowed at the sum last above set forth; that thereafter, and on the 28th day of April, 1899, a dividend of 15 per cent upon all claims which were allowed against said bankrupts' estate was duly declared by the referee herein, and that said dividend was paid to the various creditors who had proved their claims, including appellants'; that the amount of the dividend paid to appellants was $464.10, which money appellants still retain, no part thereof having been repaid or returned to the trustee herein or anybody acting on behalf of said trustee.

"*Seventh.* That at the time of the allowance of said claim and the declaration of said dividend and the payment thereof, the trustee was not aware of the fact that said appellants had received any preference on their claim and demand against said bankrupts.

"*Eighth.* That said appellants have refused to surrender to the trustee the amount of the payment made to them by said bankrupts above set forth as a condition of the allowance of their said claim, and have by their counsel declared that it is the intention of said claimants to retain the full amount of said payment so made to them by said bankrupts, and not to surrender the same.

"*Ninth.* That the appellee, Chicago Title and Trust Company, trustee, which had been duly appointed trustee of the bankrupt estate of said Frank Brothers, filed its petition praying that the claim of appellants against the bankrupts' estate be reconsidered and rejected, and that said appellants be ordered and required to repay to the trustee the amount of the dividend on the said claims theretofore paid to appellants, the grounds of said petition being that said appellants had within four months prior to the adjudication in bankruptcy of said bankrupts received large sums of money as preferences, which

preferences said appellants had not surrendered; that said appellants appeared in said proceedings and answered said petition.

"That the referee upon the evidence presented before him decided that the said payment made by the bankrupts to said appellants constituted a preference, and that by reason of said preferences the appellants' claim should be reconsidered and rejected, and that appellants should repay to appellee the amount of the dividend on appellants' said claim theretofore paid by appellee to them, the sum of $464.10; that upon appellants' application and upon the certification of the questions presented to the United States District Court for the Northern District of Illinois, the decree of the referee was confirmed, and an order in the District Court was entered in accordance with the referee's said report, from which order an appeal was taken to this court.

"Upon the foregoing facts this court makes the following conclusions of law:

"*First.* That the payment made by appellants to the bankrupts at the time and in the manner above shown constitutes a preference, and that by reason of the failure and refusal of said appellants to surrender said preferences they were not entitled to prove their claim against the bankrupts' estate.

"*Second.* That the District Court had the power and authority to order, require and compel appellants to repay to the trustee the amount of the dividend received by appellants."

*Mr. Henry Ach* and *Mr. A. J. Pflaum* for appellants. *Mr. George Packard, Mr. Joseph M. Rothschild,* and *Mr. S. O. Levinson* were on their brief.

*Mr. Eli B. Felsenthal* and *Mr. Herman Frank* for appellee.

MR. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.

The question presented by this record is whether payments in money made by an insolvent debtor to a creditor, the debtor not intending to give a preference, and the creditor not having rea-

sonable cause to believe a preference was intended, did neverthe-less constitute a preference within the meaning of the bankrupt act of 1898, and were required to be surrendered as a condition of proving the balance of the debt or other claims of the creditor.

The solution of the question depends primarily upon the intrepretation of subdivisions " *a* " and " *b*," section 60, of the law of July 1, 1898, c. 541, and certain related sections. Subdivision " *a* " of section 60 is as follows:

" Preferred Creditors.—*a.* A person shall be deemed to have given a preference if, being insolvent, he has procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

It will be observed that payments in money are not expressly mentioned. Transfers of property are, and one of the contentions of appellants is that by " transfers of property," payments in money are not intended. The contention is easily disposed of. It is answered by the definitions contained in section 1. It is there provided that " ' transfer' shall include the sale and every other and different mode of disposing of or parting with property or the possession of property, absolute or conditional, as a payment, pledge, mortgage, gift or security." It seems necessarily to mean that a transfer of property includes the giving or conveying anything of value—anything which has debt paying or debt securing power.

We are not unaware that a distinction between money and other property is sometimes made, but it would be anomalous in the extreme that in a statute which is concerned with the obligations of debtors and the prevention of preferences to creditors, the readiest and most potent instrumentality to give a preference should have been omitted. Money is certainly property, whether we regard any of its forms or any of its theories. It may be composed of a precious metal, and hence valuable of itself, gaining little or no addition of value from the attributes which give it its ready exchangeability and currency. And its

other forms are immediately convertible into the same precious metal, and even without such conversion have, at times, even greater commercial efficacy than it. It would be very strange indeed if such forms of property, with all their sanctions and powers, should be excluded from the statute, and the representatives of private debts which we denominate by the general term "securities" should be included. We certainly cannot so declare upon one meaning of the word "transfer." If the word itself permitted such declaration, which we do not admit, the definition in the statute forbids it. "Transfer" is defined to be not only the sale of property, but "every other mode of disposing or parting with property." All technicality and narrowness of meaning is precluded. The word is used in its most comprehensive sense, and is intended to include every means and manner by which property can pass from the ownership and possession of another, and by which the result forbidden by the statute may be accomplished—a preference enabling a creditor "to obtain a greater percentage of his debt than any other creditors of the same class."

But it is said "that Congress in passing the law had in mind the distinction between the payments of money and the transferring of property; otherwise they indulged in tautology" in subdivision (*d*). By that it is provided: "If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by or against him, *pay money* or *transfer property* to an attorney and counsellor at law, solicitor in equity, or proctor in admiralty, for services to be rendered, the transaction shall be re-examined by the court on petition of the trustee or any creditor, and shall only be held valid to the extent of a reasonable amount to be determined by the court, and the excess may be recovered by the trustee for the benefit of the estate."

That all the words of a statute should, if possible, be given effect we concede, but tautology sometimes occurs. Is there not an example in subdivision (*e*) of section 67 (which, by the way, and notwithstanding, is relied on by the appellants)? It provides that "all conveyances, *transfers*, assignments, or incumbrances of his property, or any part thereof, made or given by a person adjudged a bankrupt," in fraud of creditors, shall be null and void as to them.

Manifest tautology, but certainly not used to detract from the definition of "transfer" in section 1, or to exclude application of that section in proper cases. Conveyances, assignments and incumbrances of property are but modes of its absolute or conditional disposition (transfer), as payment of money is a mode of its disposition (transfer), and there was a particular expression of each mode on account of the primary purpose to be secured in each case—the purpose being, in 60 (*d*), to control payments to attorneys; in 67 (*e*), the purpose being to prohibit the disposition of property by the debtor to persons other than creditors in fraud of the act.

But, construing transfers of property to include payments of money, it is nevertheless urged, that not only must the act and state of mind of the giving debtor be considered, but the act and state of mind of the receiving creditor must be considered. It is not enough that an advantage in fact be given, but to make it a preference "the person receiving it or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended, thereby to give a preference." In other words, it is contended that the quoted words should be read into subdivision (*a*) from subdivision (*b*), and the necessity of doing so is claimed to be established by other sections of the statute. The other sections are inserted in the margin.[1]

---

[1] SEC. 60 *c.* If a creditor has been preferred, and afterwards in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him.

SEC. 3. Acts of Bankruptcy.—*a.* Acts of bankruptcy by a person shall consist of his having (1) conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, any part of his property with intent to hinder, delay or defraud his creditors, or any of them; or (2) transferred, while insolvent, any portion of his property to one or more of his creditors with intent to prefer such creditors over his other creditors.

SEC. 3 *b.* A petition may be filed against a person who is insolvent and who has committed an act of bankruptcy within four months after the commission of such act. Such time shall not expire until four months after (1) the date of the recording or registering of the transfer or assignment when the act consists in having made a transfer of any of his property

Section 60 (*b*) is as follows:

" If a bankrupt shall have given a preference within four months before the filing of a petition, or after the filing of the petition and before the adjudication, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

Subdivisions (*a*) and (*b*) are concerned with a preference given by a debtor to his creditor. Subdivision (*a*) defines what shall constitute it, and subdivision (*b*) states a consequence of it— gives a remedy against it. The former defines it to be a transfer of property which will enable him to whom the transfer is made to obtain a greater percentage of his debt than other creditors. The latter provides a consequence to be that the transfer may be avoided by the trustee and the property or its value recovered, provided, however, that the preference was given four months before the filing of the petition in bankruptcy or before the adjudication, and the creditor had reason to believe a preference was intended. So far, so clear. If the con-

---

with intent to hinder, delay or defraud his creditors or for the purpose of giving a preference as hereinbefore provided, or a general assignment for the benefit of his creditors, if by law such recording or registering is required or permitted, or if it is not, from the date when the beneficiary takes notorious, exclusive, or continuous possession of the property unless the petitioning creditors have received actual notice of such transfer or assignment.

SEC. 67 *d*. Liens given or accepted in good faith and not in contemplation of or in fraud upon this act, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall not be affected by this act.

SEC. 68. Set-offs and Counter Claims.—*a*. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated, and one debt shall be set-off against the other, and the balance only shall be allowed or paid.

*b*. A set-off or counter claim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate; or (2) was purchased by or transferred to him after the filing of the petition, or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent, or had committed an act of bankruptcy.

ditions mentioned exist, the preference may be avoided. But if the person receiving the preference did not have cause to believe it was intended, what then? It follows that the condition being absent, its effect will be absent. In other words, he may keep the property transferred to him, whether it be a complete or partial discharge of his debt. But if only a partial discharge, may he prove the balance of his debt or other debts?

Section 57 (*g*) provides for such case. "The claims of creditors," it provides, "who have received preferences shall not be allowed unless such creditors have surrendered their preferences."

There is certainly no ambiguity so far. What a preference is, is plain. What the effect of it is, if taken under the conditions mentioned, is equally plain. So taken, it may be recovered back. If not so taken, it may be kept or surrendered. Unless surrendered, he who received it cannot prove his debt or other debts. His election is between keeping the preference and surrendering it. That is the favor of the law to his innocence, but, aiming to secure equality between him and other creditors, can the law indulge farther? He may have been paid something—maybe a greater percentage than other creditors can be. That is his advantage, and he may keep it. If paid a less percentage he can obtain as much as other creditors by surrendering the payment, and an equality of distribution of the assets of the bankrupt is assured. The effect is equitable, and that it was intended is supported by prior legislation.

The bankrupt act of 1867 had provisions against preferences. Secs. 23 and 35; secs. 5084 and 5128, Rev. Stat. They could be recovered and had to be surrendered to enable the creditor to prove his debt, but the law was careful to express upon what condition in each case. They could be recovered back if the creditor had "reasonable cause to believe" the debtor was insolvent, and they were given "in fraud of the provisions of the act." Sec. 5128, Rev. Stat. They had to be surrendered if received under like condition. Section 5084, Rev. Stat., provided that "any person who . . . has accepted any preference *having reasonable cause to believe that the same was made or given by the debtor* contrary to any provision of the act,

March 2, 1867, chap. 176, . . . shall not prove the debt or claim on account of which the preference is given, nor shall he receive any dividend therefrom until he shall first surrender to the assignee the property, money, benefit or advantage received by him under such preference."

The words in italics are omitted from the act of 1898. Was the omission without purpose? The omission of a condition is certainly not the same thing as the expression of a condition. Was it left out in words to be put back by construction? Taken from the certainty given by prior use and prior decisions and committed to doubt and controversy? There is a presumption against it. When the purpose of a prior law is continued usually its words are, and an omission of the words implied an omission of the purpose. This rule we lately applied in *Bardes* v. *First National Bank of Hawarden*, 178 U. S. 524. In that case, in determining whether the jurisdiction of the Circuit and District Courts of the United States was concurrent with the state courts in certain suits at law and equity between the assignee in bankruptcy and the adverse claimant of property of the bankrupt, the statutes of 1841 and 1867 were compared with that of 1898, and from the omission from the latter of certain provisions of the former statutes it was decided that such jurisdiction did not exist. It was said by the court, speaking by Mr. Justice Gray: "We find it impossible to infer that when Congress, in framing the act of 1898, entirely omitted any similar provision, and substituted the restricted provisions of section 23, it intended that either of those courts should retain the jurisdiction which it had under the obsolete provision of the earlier acts."

We might rest the discussion here, but counsel have ably urged against our interpretation of the statute considerations which should be noticed. They assert its incorrectness because: (1) That the provisions of 57 (*g*) which deny allowance to the claims of creditors unless such creditors surrender the preferences they have received, are penal and should be strictly construed. Being penal, it is contended, there should be a guilty intent to incur their punishment. (2) Of the defectiveness of 60 (*a*) and the necessity of explaining it and enlarging it by

other provisions. (3) Of the consequences of the construction—consequences which are declared to be anamolous and even absurd.

1. We cannot concur in the view that 57 (*g*) is a penal requirement. It is hardly necessary to assert that the object of a bankrupt act, so far as creditors are concerned, is to secure equality of distribution among them of the property of the bankrupt—not among some of the creditors, but among all of them. Such object could not be secured if there were no provisions against preferences—no provisions for defeating their purpose. And it is no reflection on the statute that it does not do so entirely. It allows complete payments, and counsel has seen and urges what seems to be inequitable in that—the giving favor to the diligence which secured it, and strongly argues that if complete payments may be retained without penalty, why not partial payments; if diligence (and diligence is made a great deal of in the argument) is favored in the one case, why not in the other? The view is too narrow and partial. Comparing such creditors, there may be inequality, but, considering other creditors, what shall be said? Some thought must be had of them, and considering them—indulgent creditors as well as diligent creditors—an attempt to secure the best remedies and results in the circumstances was, no doubt, the aim of the legislature. An advantage may be left with the preferred creditor. As we have already said, if the preference exceed the share of the bankrupt's estate which the creditor would be entitled to, he may keep the preference. If it be less, he may surrender it and share equally with the other creditors. If the purposes of the statute are to be considered, this is certainly not punishment but benefit. If it is discrimination at all, it is discrimination against the other creditors.

2. Undoubtedly all the sections of the act must be construed together as means to effect its purpose, and some of its sections are closely related. It does not follow, however, that each section should not be given the meaning its language conveys, if clear and consistent. It does not follow that because the terms of a section are defined elsewhere, or the consequences of its provisions are expressed elsewhere, it becomes a nullity or is

defective. Not that we may not "travel outside," to use counsel's expression, of any section if it be necessary to travel outside. We may travel outside for some things, not necessarily for all things. The argument is, you must travel outside of subdivision (*a*) for a time within which the preference must have been given, and four months are selected in analogy to subdivision (*b*) and of section 3 (*b*). This may be conceded, and the meaning of subdivision (*a*) would not be otherwise altered. There would still remain a clear definition of a preference.

The argument is strong which is urged to support a four months' limitation, but it can be argued in opposition that subdivision (*a*) needs no explanation from other parts of the statute " in order to obtain a time limit on the question of preference." It can be argued that subdivision (*a*) gives such limit in the existence of insolvency. But we are not required to decide either way on this record. A time limit is entirely independent of the belief of the creditor or of the belief which may be attributed to him—entirely independent of his right to a greater proportion of the bankrupt's property than other creditors. It is urged, however, that a time limit—whether of four months or extending indefinitely before the filing of the petition in bankruptcy having no limit but the statute of limitations —differently affects the creditor receiving the preference, and the difference should be considered in construing the statute. It is pointed out that insolvency has a different meaning under the act of 1898 than it had under the act of 1867. Under the latter, the debtor was insolvent when he was unable to pay his debts in the ordinary course of business. Under the former, when the aggregate of his property at a fair valuation is insufficient to pay his debts, and, it is said, this being practically impossible to ascertain on account of the uncertainty of its factors, therefore a time limit to a preference is necessary, and also that there should be a guilty knowledge on the part of the creditor of the guilty intent upon the part of the debtor. There are two weaknesses in the argument. It ascribes a penal character to section 57 (*g*), and regards the requirement of the surrender of the preference as a condition of proving debts as a

punishment and not a provision to secure equality among creditors. On this we have sufficiently commented. The other weakness in the argument is that it exaggerates the difference between the definitions of insolvency and overlooks an advantage to the creditor in the definition contained in the act of 1898. Inability to pay debts in the ordinary course of business usually accompanies an insufficiency of assets. It may not, of course. At times a debtor's property, though amply sufficient in value to discharge all his obligations, may not be convertible without sacrifice into that form by which payments may be made. The law regards that possibility. In this there is indulgence to the debtor, and through him to preferred creditors. But the discussion need not be extended. The law has made its definition of insolvency, whatever the effect may be, and has determined by that definition consequences not only to the debtor but to his creditors and to purchasers of his property.

3. It is but one rule of construction that the consequences of a statute may be considered in construing its meaning. The rule may be counterpoised by other rules; it may be prevailed over by that one which requires the intent of the statute to be looked for in its words. Where they are clear and involve no absurdity, they are its only expositors. It is not contended that the provisions which we are considering are not clearly expressed and adequate to convey a definite meaning. It is true, it is urged that the word preference imports the conscious participation of the creditor and debtor in the same intent. We cannot concur in that view, and we are brought to the consequences of the construction which we have put upon section 60. It is denominated absurd by appellants. What is the test of absurdity? The contradiction of reason, it may be said, and to make an immediate application to legislation, the contradiction of the reason which grows out of the subject matter of the legislation and the purpose of the legislators. But all legislation is not simple nor its consequences obvious or to be controlled, even if obvious. Whether there should be any legislation at all and its extent and form may be matters of dispute. Its consequences may be viewed with favor or with alarm;

some regretted but accepted as inevitable—accepted as the shadow side of the good. In such situation it is for the legislature to determine, and it is very certain that the judiciary should not refuse to execute that determination from its view of some consequence which (to use the thought and nearly the words of Chief Justice Marshall) may have been contemplated and appreciated when the act was passed, and considered as overbalanced by the particular advantages the act was calculated to produce. *United States* v. *Fisher*, 2 Cranch, 358, 389. Therefore the sound rule expressed in *Sturgis* v. *Crowninshield*, 4 Wheat. 202: "It would be dangerous in the extreme, to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation. Where words conflict with each other, where the different clauses of an instrument bear upon each other, and would be inconsistent unless the natural and common import of words be varied, construction becomes necessary, and a departure from the obvious meaning of words is justifiable. But, if in any case, the plain meaning of a provision, not contradicted by any other provision in the same instrument, is to be disregarded, because we believe the framers of that instrument could not intend what they say, it must be one in which the absurdity and injustice of applying the provision to the case, would be so monstrous that all mankind would, without hesitation, unite in rejecting the application."

So in *United States* v. *Goldenberg*, 168 U. S. 95, 103, where Mr. Justice Brewer, answering the argument based on the consequences of an act of Congress against the meaning expressed by its words, said:

"No mere omission, no mere failure to provide for contingencies, which it may seem wise to have specifically provided for, justify any judicial addition to the language of the statute. In the case at bar the omission to make specific provision for the time of payment does not offend the moral sense; *Holy Trinity Church* v. *United States*, 143 U. S. 457; it involves no injustice, oppression or absurdity, *United States* v. *Kirby*, 7 Wall. 482; *McKee* v. *United States*, 164 U. S. 287; there is no overwhelming necessity for applying in the one clause the same

limitation of time which is provided in the other. *Non constat* but that Congress believed it had sufficiently provided for payment by other legislation in reference to retaining possession until payment or security therefor; or that it failed to appreciate the advantages which counsel insists will enure to the importer in case payment does not equally with protest follow within ten days from the action of the collector; or that, appreciating fully those advantages, it was not unwilling that he should enjoy them."

Let us apply these principles to the present case. The consequences of the construction of the Circuit Court of Appeals is said to be that it will "harass and embarrass the business of the country," and the specification is that any payment to a creditor may become a preference and the alternative forced upon him of giving it up or losing the right to prove his claim or claims against his debtor's estate. That consequence does not seem to us very formidable even in the instance of payments to private bankers by their depositors as illustrated by counsel or, as also illustrated if the payments should be distributed as gifts to relatives, or to endow universities, and cannot be obtained to be surrendered. Granting that such situation may be produced, is it anything after all but putting the creditor to an election of comparative and debatable courses where some loss must occur, whichever be taken? Business life has many such examples, and a law which has that consequence in seeking equality among creditors is certainly not absurd in even the loosest and most inconsiderate meanings of the word. Other illustrations are used which present the same situation or depend upon it—that is, the election which a preferred creditor is forced to make in order to prove his debts. A trader is insolvent and owes $100,000. His assets are $75,000. He owes $50,000 to A and B; the other $50,000 to other letters of the alphabet. He makes payments to the latter in order to prefer them, and then goes into bankruptcy. A and B having nonpreferred, hence provable claims, elect a trustee. What of the other creditors? Counsel having full control of the imaginary situation makes them ignorant of the debtor's affairs, and therefore unwilling to risk a division with A and B. That it is possible for such

ignorance and doubt to exist may be conceded, but it does not occur to us how either can reasonably continue for the time debts may be proved against the estate under the disclosures required of the bankrupt by the statute, and the information obtained by the trustee of the estate in its administration.

But is said a debtor may even make money by going into voluntary bankruptcy, and the result is worked out by circumstances carefully imagined to that end, combined with, as absolutely necessary to the result, the ignorance and timidity of creditors. The illustration is that, suppose a bankrupt has made partial payments to every one of his creditors within four months preceding bankruptcy; that his assets at the time of the filing of the petition amounted to $50,000, and his liabilities to $100,000. Hesitating in this extraordinary situation to surrender their payments—no creditor being tempted by $50,000—the conclusion is confidently advanced that "if the construction of the court below is sound, there are no creditors who have provable claims against the bankrupt." And the query is put, who gets the $50,000? The implied answer is, that the bankrupt gets them, and the result is easily pronounced absurd. It is an absurdity which the "construction of the court below " is not responsible for. What a court would do with such a scheme as a fraud upon the act, we are not called upon to say. We may well doubt if a scheme of that kind will ever come up for decision. We find it impossible to conceive a case in which $50,000, or, indeed, any surplus, would not be an inducement to some creditor to add it, or some portion of it, to the payment of his claim.

It is further contended " that to constitute a preference under the bankruptcy act within either 57 (g) or 60 (a), at least *the intent on the part of the bankrupt to prefer must be* present." In support of this it is said that an act of bankruptcy consists under section 3 (2) of a transfer by a debtor while insolvent of any portion of his property to one or more of his creditors, *with intent to* prefer such creditors over other creditors, and in such a case a petition in involuntary insolvency may be filed against him. Section 3 *b.* It is hence deduced, reading those provisions with section 60 (*a*), that preferences under the latter must be

taken with the intent declared in the former, because it is not reasonable to assume that Congress intended that there could be preferences which were not acts of bankruptcy. The claim overlooks the fact that the language of section 3 (2) implies a difference between a preference and the intent with which it is given, and besides confounds the different purposes of the sections and their different conditions. It was for Congress to decide whether the consequences to a debtor of being forced into bankruptcy so far transcended the consequences to a creditor by a surrender of his preference, as to make the former depend upon an intent to offend the provision of the statute and the latter not so depend. And we see nothing unreasonable in the distinction or purpose. Nor does the contention of appellants find support in the provisions of the act of 1867, and the cases of *Mays* v. *Fritton*, 20 Wall. 414, and *Wilson* v. *City Bank*, 17 Wall. 473. In that act there was a careful expression of the intent of the debtor (section 5021, Rev. Stat.) and as careful an expression of the state of mind of the preferred creditor. Secs. 5084, 5128.

Nor again do we find anything which militates against our conclusion in subdivision "*c*" of section 60. That subdivision is applicable to the cases arising under "*b*," and allows a set-off which otherwise might not be allowed.

The interpretation of the statute which we have given has also been given by the Circuit Court of Appeals of the Ninth Circuit, in a well considered opinion by Circuit Judge Morrow, in the matter of *Fixen, Bankrupt*, 102 Fed. Rep. 295.

The second assignment of error is that the court erred in compelling the appellants to repay the amount of dividends received by them. Error is asserted because of the provision of subdivision "*b*" of section 23. The whole section is as follows:

"Jurisdiction of the United States and state Courts.—*a.* The United States Circuit Courts shall have jurisdiction of all controversies at law and in equity, as distinguished from proceedings in bankruptcy, between trustees as such and adverse claimants, concerning the property acquired or claimed by the trustees, in the same manner and to the same extent only as though bank-

ruptcy proceedings had not been instituted and such controversies had been between the bankrupts and such adverse claimants.

"*b.* Suits by the trustee shall only be brought or prosecuted in the courts where the bankrupt, whose estate is being administered by such trustee, might have brought or prosecuted them if proceedings in bankruptcy had not been instituted unless by consent of the proposed defendant.

"*c.* The United States courts shall have concurrent jurisdiction with the courts of bankruptcy, within their respective territorial limits, of the offences enumerated in this act."

The proceedings we are reviewing were not a suit within the meaning of that section, and the order of the court requiring the repayment of the dividend was properly and legally made.

*Judgment affirmed.*

The CHIEF JUSTICE, Mr. Justice SHIRAS, Mr. Justice WHITE and Mr. Justice PECKHAM dissented.