## In re WOLF & LEVY.

### (District Court, W. D. Tennessee. March 3, 1903.)

1. BANKRUPTCY—DATE OF PREFERENCES—PAYMENT OF NOTE.

   Where a bankrupt gave his note to a creditor, which he afterward paid, the preference, if any, was in the payment, and not in the giving of the note, and must be considered as having been given at the date of such payment.

2. SAME—PROVABLE CLAIMS—SURRENDER OF PREFERENCES.

   Where a creditor received payment in full from his debtor within four months prior to the latter's bankruptcy, but without knowledge of his insolvency, and afterward sold him another invoice of goods, which were not paid for at the time of the bankruptcy, the transaction is not one of receiving a preference and giving a new credit, within the meaning of Bankr. Act § 60c, but the last sale creates a new and separate debt, which may be proved without a surrender of the money received in payment of the previous debt.

In Bankruptcy. On review of decision of referee.

T. M. Scruggs, for creditor company.

Myers & Banks, for trustee.

HAMMOND, J. Chronologically, the facts may be stated that on September 3, 1901, the Sachs Shoe Manufacturing Company sold an invoice of shoes to Wolf & Levy amounting to $189.75, on the 6th of September another invoice of $74.40, and that on the 28th of September there was a credit on this account of $4.50 for a "sign"—whatever that may mean—leaving October 31, 1901, a balance due of $259.65, for which amount Wolf & Levy executed their note on the 26th of December, 1901, payable at 90 days. On the 6th of March, 1902, the shoe company sold another invoice of shoes to Wolf & Levy, amounting to $72. On the 20th of March, 1902, the note of $259.65 was paid by Wolf & Levy to the shoe company, and on the 14th of April, 1902, the last invoice of shoes above mentioned, for $72, was paid in cash, settling the account in full. On the 16th of April, 1902, another invoice of shoes was sold by the company to Wolf & Levy, amounting to $115.50, which has never been paid.

On the 25th of April, 1902, an involuntary petition in bankruptcy was filed against Wolf & Levy by certain of their home creditors, which they answered on the same day, admitting their bankruptcy, and willingness to be adjudicated, which was done on that day accordingly. In the due course of administration, on the 2d of June, 1902, the Sachs Shoe Company filed their proof of debt for $115.50, stating the account in the usual form, making an item of one case of shoes at $42, another case at $42, and still a third case of $31.50, aggregating the $115.50 above mentioned; and on this sum they received the common dividend paid all the creditors. At a date not appearing in the record, and upon the application of the trustee before the referee, this claim was re-examined and expunged, and the shoe company ordered to refund the dividend unless they should surrender the payments of $259.65 on the note and the $72 in cash above mentioned, as preferences received by the creditor company against the provisions of the bankruptcy statute; and thereupon this petition for review was

filed by the creditor company, and the case certified under general order 28 (89 Fed. xi).

It appears from the referee's report that on the ledger of the Sachs Shoe Manufacturing Company, in the ordinary form of bookkeeping, these dealings appear as follows:

| Dr. | | | | | Sachs Shoe Mfg. Co. Cin. O. | | | | | Cr. |
|---|---|---|---|---|---|---|---|---|---|---|
| 1901 Sept. | 28 | To Sign | 4 | 50 | 189 74 | 75 40 | 1901 Sept. " | 3 6 | By Mdse. " " | |
| Oct. | 31 | " Balance | 259 | 65 | | | | | | |
| | | | 264 | 15 | 264 | 15 | | | | |
| Dec. | 26 | March 20 " Bills Pay. Pd. | 259 | 65 | 259 | 65 | Nov. | 1 | " Balance | |
| 1902 Apr. | 14 | " Cash | 72 | | 72 | | 1902 Mch. | 6 | " Mdse. | |
| | | | | | 115 | 50 | Apr. | 16 | " Mdse. | |

But in the findings of the referee he reforms the account of the dealings by stating it as follows:

Wolf & Levy, to Sachs Shoe Mfg. Co., Dr.

| September | 3rd, 1901. | To merchandise.................... | $189 75 |
|---|---|---|---|
| September | 6th, 1901. | " " .................... | 74 40 |
| March | 6th, 1902. | " " .................... | 72 00 |
| April | 16th, 1902. | " " .................... | 115 50 |
| | | | $451 65 |

Credits.

| September | 28th, 1901. | By Sign.......................... | $ 4 50 |
|---|---|---|---|
| March | 20th, 1902. | " Cash.......................... | 259 65 |
| April | 14th, 1902. | " " .......................... | 72 00 |
| | | | $336 15 |

The referee finds that the payments made were a preference contrary to the bankruptcy statute, amounting to $331.65, from which he allows a deduction of $187.50, the new credits given by the invoice of $72 and $115.50, respectively, which leaves a preference to be surrendered by the creditor company of $144.15 before they will be allowed to prove their claim and share in the dividends. Another finding of the referee is that Wolf & Levy were insolvent nearly a year before the petition in bankruptcy was filed, but of this fact it does not appear that the creditor company had any knowledge.

If the giving of the note on the 26th day of December, 1901, and not the payment of it, constituted the preference, as suggested by counsel, on the authority of Dickinson v. Security Bank, 49 C. C. A. 84, 110 Fed. 353, there would be a close question as to whether the preference was within the four months, upon a proper computation of that period of time as directed by section 31 of the bankruptcy statute of 1898 [U. S. Comp. St. 1901, p. 3434], and the ruling under the former statute found in Dutcher v. Wright, 94 U. S. 553, 24 L.

Ed. 130, and other cases—especially Re Stevenson (D. C.) 94 Fed. 110. The terminus a quo being the 25th of April, the terminus ad quem ordinarily would be December 25th, and the 26th of December obviously would be within the four months. But under a proper rule of computation, the 25th of December being Christmas and a legal holiday, is it to be counted at all, if section 31 of the act of 1898 has any bearing on the question? Or, outside that section, how would it be treated under the general law? And would the last day be December 24th or December 26th, under a proper ruling? If it be the 26th, it is well known that courts sometimes do deal with the fractions of a day, and determine according to the fact whether or not the one act precedes the other, where the two are thus related to each other. But fortunately these puzzling questions are not presented, because in Dickinson v. Security Bank, supra, the note surrendered as a preference was that of a third party, and not the note of the bankrupt debtor himself. In this case the note of the bankrupt debtor cannot be treated as the giving of a preference, but that transaction must be predicated as of the 20th of March, 1902, when the payment of it was made.

The court does not agree with the referee that these payments were a preference within the condemnation of the bankruptcy statute. They can only be made so by the unauthorized consolidation of entirely independent and separate transactions, treating them all as dealings upon an "account current," and not separate and independently closed transactions, as the parties themselves carried on their dealings. I know of no provision in the bankruptcy statute that authorizes the trustee to take any such liberties with the dealings of the debtor and creditor with each other, so that he shall force them into a dealing upon open account, receiving partial payments, when in fact they deal between themselves otherwise. It is not a matter of bookkeeping, and neither party can control the rights of the other by any manipulation of the transactions through differing processes of bookkeeping. Neither of the payments made to this creditor company was a partial payment upon an open account or "account current," except the insignificant item of $4.50 for the sign, which, upon the maxim de minimis, will be disregarded here. On the 26th of December the debtor closed the account then subsisting with his creditor by giving a note for the amount due. Thereafter the debtor owed no open account, and nothing but the note, until March 6, 1902, a period of 70 days, when another transaction was had, by the sale of another invoice of goods at $72, which was paid for in cash 39 days thereafter—possibly the contract being an ordinary 30-days bill, though that point has not been brought out in the proof—when the account was again entirely closed. Two days subsequently another invoice was sold, possibly, again, upon 30 days' time (though that point has not been brought out in the proof), which has never been paid, the bankruptcy intervening. The creditor company properly proved the only debt it had existing against the bankrupts at the date of their adjudication.

By the proceeding here under review, in order to bring the case within the ruling of Pirie v. Trust Company, 182 U. S. 438, 21 Sup.

Ct. 906, 45 L. Ed. 1171, and make the payments that it received partial payments upon an open or "account current," the trustee has forced the creditor company, contrary to the fact, to treat these dealings as continuing transactions upon account, instead of as closed transactions by note and by payments in full, which were entire settlements of the two accounts before the bankruptcy took place, except the last invoice, which in fact constituted a wholly new and independent account, as the parties themselves dealt with each other. This is a twist of the garrote of section 57g of the bankruptcy statute, which is not justified by the Supreme Court in Pirie v. Trust Company, supra, nor is it justified by anything found in the rulings of that case. That was in fact an account current, upon which partial payments had been made, and there was no indication of an account closed by note or by the payment of cash, as in this case before the last invoice was sold to the bankrupts. The language of the Supreme Court in the statement of that case is "that said appellants, in the regular and ordinary course of business, and within four months prior to the adjudication of bankruptcy herein, did collect and receive from the said bankrupts, as partial payment of said account for such goods, wares, and merchandise so sold and delivered to said Frank Bros., the sum of $1,336.79, leaving a balance due, owing, and unpaid, amounting to $3,033.98." 182 U. S., at page 440, 21 Sup. Ct., at page 907, and 45 L. Ed. 1171. There is not the least similarity between the transactions of that case and this, except by the unauthorized distortion of the pre-existing facts for the purpose of affixing a penalty of a preference upon the creditor. Therefore the case of Pirie v. Trust Co., supra, cannot control our judgment in this case. According to that case, if this creditor had received a partial payment upon its "account current" for $115.50—the only account current which it had—it could not prove that account without surrendering such a payment as a preference; but the case does not authorize the ruling that it is to surrender any payments that it has received in full within the four months upon other debts which it had against the debtor.

There has been a constant struggle since the opinion in Pirie v. Trust Co., supra, to extend its authority by enlarging its scope, contrary to the limitations put by the Supreme Court itself upon the authority of all its decisions by the cases of Cohens v. Virginia, 6 Wheat. 264, 399, 5 L. Ed. 257; U. S. v. Wong Kim Ark, 169 U. S. 649, 679, 18 Sup. Ct. 456, 42 L. Ed. 890; Leisy v. Hardin, 135 U. S. 100, 134, 135, 10 Sup. Ct. 681, 34 L. Ed. 128; and other cases to which these will be a guide. And in the case In re Dickson, often cited sub nom. Dickson v. Wyman, 49 C. C. A. 574, 111 Fed. 726, 728, the court well remarks that there must be a limit to the literalism of construction under the authority of that decision, lest there be a result of gross injustice, and sometimes absurdity. That case establishes that it is not every payment, even when made on an "account current" within the four months, that is a preference; and in Re King Co. (D. C.) 113 Fed. 110, with irrefragable logic, it is demonstrated that even under section 60b it is not every payment with guilty knowledge of insolvency that constitutes a preference,

on the principle of Re Dickson, supra, and Jaquith v. Alden, 9 Am. Bankr. R. 165, 118 Fed. 270.

These cases halt at the injustice of the literalism of the statute, and take out of it, or, rather, refuse to put within it, a case where the "new credits" exceed the so-called preferences, and the net result is an increase of the original indebtedness. The reasoning is not very satisfactory to my mind for making a distinction between an indulgent creditor who happens to give more new credit than he receives in payments, and another indulgent creditor who happens to give less. That conclusion, it seems to me, depends upon a somewhat like literalism of construction with that which is condemned by those cases. It is true that the estate of the debtor is increased, in a sense, by the larger credit, and also it is, in a sense, increased by the lesser credit; but in neither case is it often true that the increase remains for distribution among all creditors at the time of the bankruptcy, and this increase in either case can only be predicated of the very moment the new credit is given by the creditor and received by the debtor. Whether either, be it more or less, redounds to the advantage of other creditors, depends upon a vast variety of conditions or circumstances in their relation to each other rather than upon the mere view of that one particular transaction as between that one creditor and the debtor. There would have to be a gathering together of all assets, including all payments and all "preferences," and a balancing of these with all debts due by the debtor to all creditors, within the four months, before it could be said that any new credit, be it more or less than the payments received, had "correspondingly increased the bankrupt's estate." The point of view of the reasoning is too narrow, in my judgment, when it is confined to a mere consideration of the dealings of that one creditor with the insolvent debtor, and should comprehend all dealings and a marshaling of all assets on the scheme of the bankruptcy statute within the entire four months, or else should be confined to the assets on hand or recovered by the trustee for distribution at the time of the bankruptcy, when we come to act upon the definition of a "preference" found in section 60a in its application to any particular creditor.

Let us take the case of a creditor who has given more credits than he has received payments so early within the four-months period that that which he contributes to the insolvent debtor's estate has been dissipated by the time the bankruptcy occurs, and that of another creditor who gives a new credit, less the payments he has received, but so recently before the bankruptcy occurs that all this creditor contributes to the insolvent debtor's estate goes into the hands of the trustee for distribution to all the creditors. Can it be said, equitably, that the former shall be held to have received no preferences, and the latter shall be held otherwise, on the fortuitous circumstance that one is more and the other less? I do not see how it is possible to make this an equitable distinction, and the inequity of it convinces me that there must be lurking, in the reasoning by which it is reached, some fallacy.

Therefore it seems to me that all this reasoning is beside the question, and that the rule of precedent and adjudication found in

Pirie v. Trust Co., supra, however harshly it may operate in any case, strictly considered, is that, whenever a creditor has received a partial payment on his debt, that particular debt he cannot prove without surrendering the payment, if received within the four months, and at a time when the debtor was insolvent. That is the precise rule of the Supreme Court, which all must follow, and there is no indication of embarking upon any other by the marshaling of debts and credits to find "percentages," either those narrowly confined, or those comprehending the whole field of the insolvent debtor's horizon, as bounded by his four-months dealings anterior to his adjudication. It seems to be adjudged by the Supreme Court that a partial payment is, ipso facto, a preference, under the circumstances of insolvency and payment within the four months, at least as to that debt or particular claim of the creditor which is to be kept or surrendered at his option. In this case there has been no partial payment on the only debt held by the creditor which he seeks to prove, and therefore we are not concerned with a case of partial payments, to say the most of it, whether they be less or more than any new credits. The old credits were extinguished, and in the legal sense there are no new credits, but only a simple debt due upon account for goods, wares, and merchandise sold and delivered within a few days before the bankruptcy.

This consideration does not, however, dispose of this case. There is another question about which there is "as much confusion and conflict of opinion" as about that just disposed of, and also like that concerning which there is no authoritative decision: Re Seay (D. C.) 113 Fed. 969; Re Meyer (D. C.) 115 Fed. 997, 8 Am. Bankr. R. 598, and note.

Does a creditor having a subsisting debt outstanding, on which he has received no partial payment, have to surrender the money he has received in payment of other and independent debts that he once had against the bankrupt, because those debts were paid within four months of the bankruptcy, while the debtor was insolvent, but in ignorance of such insolvency on the part of the creditor?

There are some decisions holding so, even if the payment were made more than four months before the bankruptcy, but others are altogether to the contrary. This is only another twist of the garrote of section 57g, in the free play of which the creditors of bankrupts who may have been neglectful of their claims, contrary to the maxim in that behalf (Broom's Leg. Max. 799), or who may have been indiscreet in their dealings, have seemingly an unlimited confidence. Still it is an expansion of that section which has not yet been authorized by the Supreme Court, and, in my judgment, it is a distortion of the case of Pirie v. Trust Co., supra, to find in it any support for an affirmative answer to the above question.

The reasoning in favor of such an answer begins with a setting apart of section 60a all by itself, an exaltation of it, and an assumption that it is to be unaffected by other sections in its construction; that it is to be taken literally and applied to each creditor, not comparatively with others, as on its face it seems to authorize, but all by himself, so that if, by keeping such payments, he gets more than

otherwise he would get, then it is a preference, if there shall have been insolvency.  Practically, this makes the whole thing depend on insolvency, and nothing else, and practically forbids all dealings with an insolvent, not only during the four months, but, according to some of the cases, at any time during the period of insolvency, no matter how long before the bankruptcy.  And historically this is a return to the severities and cruelties of the most ancient and ages ago discarded legislation concerning bankruptcies, against which the masterful mind of Sir Samuel Romilly declaimed so effectively—a return which, in my belief, Congress never had the least notion of making, and the amendments passed while this opinion is being written quite conclusively show that it did not.  We have already seen that some of the courts have repudiated this literalism of construction where it works a manifest injustice, but even they, as I understand them, narrow the consideration of preference or no preference, under the definitions of that section, to the particular dealings between that one creditor and the insolvent debtor; assuming that if by his dealings at any time during insolvency, or during the four months, which-ever view is taken, he has "contributed" to the insolvent debtor's holdings any "increase of estate" which might have been distributed equally to creditors, there is no preference, whether the so-called "increase" has been saved for distribution when bankruptcy occurs, or has been long since used up or dissipated by the insolvent debtor.  Evidently, this is a mere matter of construction, for there are no specific words to that effect; and, when once you open the doors for construction, they are open to any one for that purpose, according to his sense of justice, if that is to control.  If, also, you are to take into consideration not only that one particular dealing between the creditor and the insolvent debtor, but are to overhaul all his dealings within the period of insolvency or within the four months, and, by comparison and contrast of these consolidated and conglomerated dealings, to determine the question of preference, we are more at sea in the matter of construction than before.

Some of these decisions speak of the "spirit of the act" as controlling this question, but it would seem that such a groundwork of decision is quite like that of a "public policy," sometimes similarly relied on—"a very uncertain thing, upon which all sorts of opinions, each variant from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of the statutes."  Hadden v. The Collector, 5 Wall. 107, 111, 18 L. Ed. 518;  Dewey v. U. S., 178 U. S. 510, 521, 20 Sup. Ct. 981, 44 L. Ed. 1170;  Bate Refrigerat Co. v. Sulzberger, 157 U. S. 1, 37, 15 Sup. Ct. 508, 39 L. Ed. 601; St. Paul v. Phelps, 137 U. S. 528, 536, 11 Sup. Ct. 168, 34 L. Ed. 767.

It must be conceded that the bankruptcy statute is such a patchwork in its structure, for well-known reasons connected with its passage through Congress, that it is difficult to understand, and is liable to the imputation of being ambiguous.  Moreover, the truth is that it is often incongruous and so incompatible that the judicial mind is in a state of consternation at the confusion and conflict of

opinion about it, especially on this subject of preferences; even Pirie v. Trust Co., supra, having been determined by a nearly equally divided court. This condition is well described by the court in Re Topliff (D. C.) 114 Fed. 323, 325, and the only remedy is there suggested of abiding the due time when the Supreme Court shall settle these differences of opinion. It will be remembered that, before the ink was dry on the act of 1898, certain critics, disappointed at the refusal of Congress to enact the more drastic measures they had planned to prevent "frauds" and overturn "inequitable preferences," invited attention to the wide-open "ambiguities" of the act as passed, and called upon the courts, by the process of construction, to improve the law in those respects, and thereby save it from condemnation and repeal. But obviously the courts cannot thus make a better law than Congress has provided. And if they could, the improvements, perhaps, would not be most wisely made in the direction of upsetting all the dealings of insolvents with their creditors within a given arbitrary period of long time, nor within a condition of insolvency relied upon to fix such a period of relation back to do the upturning. Neither is it possible for the courts to agree upon a uniform process of supplying that which Congress failed to offer by way of express regulation in the very words of the statute itself. There is lying before me a mass of notes of all the cases citing Pirie v. Trust Co., supra, and of quite all the cases that have considered these preference sections of the statute, and it is apparent that it is an impossible task to extract from them any common method of interpretation or any general principle of reconciliation; the courts finding that harmonious construction of them is unattainable in the absence of authoritative decision.

Two of the latest as well as two of the ablest opinions considering these sections are Swarts v. Fourth Nat. Bank (C. C. A.) 117 Fed. 1, and Swarts v. Siegel (C. C. A.) 117 Fed. 13. These adopt the rulings of those cases which hold that section 57g "prohibits the allowance of any claim of a creditor who has received a preference, either upon that or upon any other claim he holds against the estate of the bankrupt, unless he has first surrendered his preference," and do not agree with the cases to the contrary of that ruling, some of which are cited in the note to the case Re Meyer, 8 Am. Bankr. R. 598, 115 Fed. 997; Re Seay (D. C.) 113 Fed. 969; and other cases to which these will be a guide—In re Steers Lumber Co. (D. C.) 110 Fed. 738, affirmed on appeal, 50 C. C. A. 310, 112 Fed. 406, 6 Am. Bankr. R. 315, 7 Am. Bankr. R. 332, being, perhaps, the leading case in favor of the contrary ruling. The task of distinguishing the cases by close comparison or contrast, or of balancing "the weight of the authority," as before remarked, is a hopeless one, and clearly the question is open for original consideration.

The case of Swarts v. Fourth Nat. Bank, supra, proceeds upon the primary assumption that "the rights and privileges of the bankrupt, and the equal distribution of his property, dominate every provision, while the rights, wrongs, benefits, and injuries of his creditors are always incidental and secondary to these controlling purposes." Again, that the "definition of a preference was not written from the

station of the creditor, but from that of the debtor." This last certainly cannot be affirmed of the definition of a preference given in section 60b, and the other is only a more elaborate statement of the rule of construction elsewhere called in the cases "the spirit of the act" or "the policy of the law," which has already been shown to be not altogether a stable guide in the construction of a statute—at least, it should not be absolutely controlling. And why, in the consideration of this question, should sections 60a and 57g, after being linked together, be disassociated from 60b and 60c, and all the rest of section 57, and general order 21 (89 Fed. ix), which speaks of the "claims" of creditors, even as does section 57g itself? Clearly implying that the same creditor may have more than one "claim" against the bankrupt, and not at all indicating that·all his "claims" are to be consolidated into one in order to work this penalty of a preference upon him? Why, it may be asked, should these two parts of sections be so exalted above all the rest of the statute, which it seems is to be sacrificed upon the altar of the predicate above quoted? Not even does section 60a, in its precise words, indicate that all the "claims" of a creditor are to be consolidated into one claim, or one debt, that he may be subjected to the process of garroting him for a "preference," because the language is, "to enable any one of his creditors to obtain a greater percentage of his debt," not of his debts; the fallacy being the unauthorized assumption, so far as express words go, that the creditor is to be taken as having only one debt, when he may have several, and may be entitled, also, to prove them in severalty, so to speak, if his interest thus requires, and also so far as any express words of this statute are to be found prohibiting that process on his part. There are no such words in the statute, so far as I can see. Wherefore, if the creditor has more claims or debts than one, and upon any one of these, as in Pirie v. Trust Co., supra, he has received a partial payment, amounting to a preference under the provisions of the act, through which he will receive a greater percentage than other creditors of the same class on that "debt," he cannot prove it without surrender. But non constat that he cannot prove other debts he may hold, on which there has been no preference; and still more does it not appear, at least on any express provisions of this statute, that he must surrender payments by which other debts have been extinguished before he can prove those he has outstanding. Can any one say, upon the logic of it, that such payments as the last above mentioned should not stand precisely upon the same footing as payments made under identically the same conditions to other creditors who have no outstanding debts against the bankrupt? Or why there should be any distinction in equity, or morals, if you choose, between the two? That is to say, is not the statute answered, wholly, as to such completed payments and extinguished debts, by requiring all who have received them to stand on the same plane or in the same "class" with each other, namely, the class created by section 60b, where knowledge of the insolvency is required, to entitle the other creditors to have such payments returned? Does it depend upon the factitious circumstance that one creditor happens to have another claim, not paid

at the time of bankruptcy, while another has none such; both being in exactly the same condition as to the extinguished claims of each, respectively? As I read it, there is not a word or phrase in the statute to justify such an inequitable distinction between creditors holding extinguished claims, if they can be called "creditors" at all, quo ad hoc; and this inequity is not answered, in my judgment, by any assumption that the statute is not concerned with the "rights, wrongs, or injuries" of creditors, or inequalities among them in respect of this.

Is it true that the statute uproots the transactions of men with each other in the commercial world, ruthlessly, in search of an equality of distribution which is not in fact realized when we come to analyze it, even upon the proposition made? Or that the statute has no concern with the injuries of the creditors? One can well understand a bankruptcy scheme, which, drawing a dead line four months anterior to the filing of the petition, or simultaneously with the moment when insolvency takes place, or within any given time anterior to the commission of an act of bankruptcy, vacates all transactions within the dead line, and gathers the things resulting for a pro rata distribution among the creditors proving their debts. This was the most ancient scheme known to bankruptcy legislation in the mother country, only there was no dead line at all, and all the transactions throughout the bankrupt's lifetime, before and after the "act of bankruptcy," no matter how secret and unknown they might have been, were ruthlessly upset, on the principle mentioned in Swarts v. Fourth Nat. Bank, supra. In the time of James I a limitation of five years anterior to the act of bankruptcy was established, and later on, by other acts, this time was reduced, until now it is three months, only; also there were other limitations, growing out of the character of the transactions themselves, from time to time placed upon this process of upsetting transactions and payments as fraudulent preferences; all these modern improvements in the law being the result of the efforts of Sir Samuel Romilly, the great reformer in the time of George III, to mitigate what he called the harsh and cruel provisions of the original and fundamental principles of the bankrupt law, which, in this process of upsetting transactions by relation as preferences, were in "utter repugnance to the state of things in a commercial country." Can it be that Congress intended by the act of 1898 to re-enact these ancient and discarded principles, as the substratum of that statute? I do not think so; nor do I think that the statute should be interpreted by the courts upon any such notion, but, rather, that it intended to deal with the creditors upon the equitable basis of equality of burdens to be borne, as well as equality of benefits to be reaped from the scheme of the statute.

Let us take the case of two creditors, each selling to the debtor, say, one Blackacre for $1,000, and the other Whiteacre for the same sum, both on a credit. When insolvency occurs, and within the four months, but without the knowledge of either creditor as to that fact, both are paid in full. Afterwards one of the creditors has another dealing with the insolvent, and sells him, let us say, one horse, also on a credit, and then bankruptcy occurs before any payment is

made. Is it possible that there can be any equity of pro rata distribution of the estate of the bankrupt in the process of refusing the latter creditor proof of his debt for the horse unless he surrenders the price paid for the land? And is there not an enormous inequity, not to say iniquity, in using section 57g to choke out of him the price received for his land, while the other creditor can stand by and securely hold the price he received for his land as against any demand the trustee in bankruptcy can make in behalf of the other creditors? There is no equitable distribution of the estate in such a process; the more indulgent creditor being made to pay a penalty for his indulgence, and to contribute the "increase" of the bankrupt's estate found in the value of his horse, without sharing it with other creditors, not more meritorious in any sense. There would be a tolerable principle, if a harsh one, in making both these creditors return the prices received for the lands, respectively, but no principle of any kind of justice in allowing one to keep what he has received, and imposing a penalty on the other if he keeps his; and this, too, upon the worthiest of the two, in their relation to the other creditors. There is such an intolerable injustice in this result, whether we view it from the station of the debtor or that of the creditors, that I cannot bring my mind to accept any construction of the statute which authorizes it, and feel there must be some misconstruction of it that implies such an intention on the part of Congress. No injustice to any creditor is worked by allowing both these supposititious creditors to stand each upon the payment he has received, under identically the same conditions of innocence, and allowing the one who has made a new debt to share with the body of the creditors what remains for distribution. The fact is, the statute does not constitute the price received for either Whiteacre or Blackacre a part of the bankrupt's estate, unless one or the other or both were received with a guilty knowledge of insolvency. This is not flying in the face of Pirie v. Trust Co., supra, for that case has, in my opinion, no bearing on the payment in full of a separate and independent debt; and, having been decided by an almost equally divided court, for that reason, if none other, neither the decision, nor its reasoning, if applicable, should be extended beyond its precise force as a precedent for other cases exactly like it. Cohens v. Virginia, supra.

Since this creditor has only one debt to prove, the others he had having been paid, perhaps the question whether a creditor having more than one "claim" can prove them separately, each on its own footing, without relation to the others, or, what is the same thing, may, in his "deposition," set out each separately, and have each treated separately on its own merits as to "preferences," does not technically arise in this case. But it is incidentally involved in the consideration of the proper construction of the statute as to the preferences that are claimed against the creditor company by the action of the trustee. My reading of the statute has not disclosed any provisions which deny this form of proof to a creditor, nor which deprive him of that right. Under section 23 of the statute of 1867 (Rev. St. § 5084; Bump, Bky. [9th Ed.] 636), this could be done; and general order 21 (89 Fed. ix), prescribing the mode of proof under the statute of

1898 is exactly the same as general order 34 (89 Fed. xiii), under the statute of 1867; the Supreme Court taking no note of any difference between the two in this regard, which it naturally would have done if there had been noticed any such radical distinction. Clearly, the notion that the creditor must surrender all preferences on all the debts he holds unpaid, before he can prove any one of them, is based on the same construction of the statute as that already considered in this opinion, and depends on the broad proposition that no creditor can share in the dividends until he has surrendered every payment on a debt received within the four months, and while the debtor was insolvent—both separate and independent debts already closed and settled, and those still held partially unsettled.

It is true that there is a noticeable difference in phraseology between section 23 of the former act and section 57g of the present act, but, after all, they may both declare precisely the same thing without doing the least violence to the language of the later act. It is one of the peculiarities, as it is one of the defects, of the act of 1898, that it undertakes, by compression of language, to express much in little, and thereby it is obscure and ambiguous to an extent that is perplexing to every court called on to construe it. There are no apt words in section 57g to express the idea that a creditor shall receive nothing on any claim he has until he surrenders all preferences on all other claims he now has, or has had within the four months or within the insolvency. To so hold is merely to construe the words of the subsection by the expansion of that which has been compressed; and when we commence to expand the language we may write it out in the language of section 23 of the act of 1867 (Rev. St. § 5084) quite as well as in the words of any other construction which is insisted on as the proper form of expansion. Nothing is to be implied from the nonuse of the precise words of the former section, because in this section and in every other section of the existing act the structural form of expression is to discard the detailed elaboration of the former statutes, and distill the essence into the fewest possible words, nearly always at the expense of perspicuity; the draftsmen seemingly overlooking the fact that a bankruptcy statute is wholly and absolutely, in all its parts and in all its principles, a mere matter of statutory regulation—a simple declaration of precisely what Congress pleases to enact within an almost illimitable range of choice, and with scarcely any restrictions whatever; so long as Congress keeps within the constitutional power to establish a uniform system of bankruptcy, and does not invade the domain of the other subjects of legislation not within its grant of power, it can adopt any scheme of bankruptcies its wisdom may dictate; nor scarcely does its legislation receive any aid, in the matter of construction by the courts, from any universal, long-established, and fixed principles, like those pertaining to equitable rights and remedies, or those concerning general legal rights and remedies. For this reason the legislation should be specific and definite in its enactments, and ample in all its parts, and certainly the section now under consideration is not so constructed. It reads as follows: "Preferred Claims. (g) The claims of creditors who have received preferences shall not be allowed

unless such creditors shall surrender their preferences." [U. S. Comp. St. 1901, p. 3443.] The whole section seems to be dealing with "claims," rather than persons, and it is "claims" that shall not be allowed. The use of the plural form is not important on the point under consideration, for the subsection is dealing with the whole body of creditors as a class, as it has been throughout the entire section 57. The plural "claims" must be used to conform to the plural "creditors" in the phrase "the claims of creditors," and the particular species of the general class next pointed out in the phrase "who have received preferences" must again take the plural form "preferences," to connect these with the antecedent plurals of "claims" and "creditors"; and so it is in the ending phrase, "such creditors shall surrender their preferences"—this form is necessary to the structural harmony of the sentence. It is a bare assumption to read the sentence as if it were written, "No creditor shall be allowed to prove any claim he has unless he shall surrender all preferences he has received on said claim or on any other claim within four months next preceding the bankruptcy and while the debtor was insolvent." This is not a necessary implication from the condensed language used, and we may as well write in the language of section 23 of the act of 1867 (Rev. St. § 5084) as the other; and if this be also a bare assumption, it has the advantage of being in consonance with the general rule of such legislation and the former act. Moreover, it does not disturb the dealings of men with each other, which have been completed by them, without the specific and definite command of the Legislature to do that thing; and, further, such is the modern rule in bankruptcy legislation. This may not be all that creditors would like to have in bankruptcy, and yet it may be all that Congress is willing to give, as is shown by the recent amendments. At last, it is all a matter of construction, and of disturbing the ordinary rule of right by construction only; and to say that this conforms to a scheme found in the statute to take everything possible from the creditors out of their past transactions, without regard to any right, wrongs, or injuries to them, is, in my judgment, petitio principii.

The state of the rulings under the act of 1867 will be found set out in Bump, Bky. (9th Ed.) 636–640, and notes; Re Holland, 8 Nat. Bankr. R. 190, Fed. Cas. No. 6,604; Re Richter's Estate, 1 Dill. 544, Fed. Cas. No. 11,803; Re Lee, 14 Nat. Bankr. R. 89, Fed. Cas. No. 8,179; Re Aspinwall (D. C.) 11 Fed. 136, 138; Re McVay (D. C.) 13 Fed. 443, 445. See, also, Re Rogers Milling Co. (D. C.) 102 Fed. 687, where it is held that these cases have no application under the act of 1898. Whether the Supreme Court will take that view, or that which is suggested here, is a mere guess, for, under such obscure language as is used on the subject, either view is open for adoption by the courts, perhaps.

But in this case, whether it be held that a creditor may prove all the claims he holds upon which he has received no preferences, and is forbidden to prove, without surrender, only such as have been partially paid, like that in Pirie v. Trust Co., supra, in the same way that he could do under the act of 1867, or not, I feel quite sure that where he holds only one claim, upon which he has received no pref-

erence, he cannot be compelled to surrender an alleged preference upon an entirely settled and extinguished debt, disconnected with the other.

The disallowance of the claim propounded by the creditor company for $115.50 was unauthorized by the statute, and the creditor will be allowed to prove and take his dividends upon it. If the payment of the note for $259.65, or the payment of the account for $72, or either of them, was a preference, against the statute, the trustee should take measures to recover it under section 60b, which is all the remedy he has under this act of 1898.

Ordered accordingly.