# EDWARDS, Trustee, Respondent, v. CARONDELET MILLING COMPANY, Appellant.

### St. Louis Court of Appeals, November 15, 1904.

1. **BANKRUPTCY: Insolvency: Intent to Prefer.** No preference is voidable at the instance of a trustee in bankruptcy unless it was made when the bankrupt was insolvent and when the preferred creditor had reasonable cause to believe the transaction was intended as a preference.

2. ——: ——: ——: **"Ground."** The use of the words "ground to believe" (the debtor intended a preference) in a declaration of law relating to such a transaction instead of the words "cause to believe," (the language of the bankrupt act), is sufficient, for the two expressions are practically synonymous.

3. ——: ——: ——: **Presumption of Intent.** In an action to avoid a preference under the bankrupt act, the intent on the part of the debtor to prefer a creditor by the transaction sought to be avoided, is presumed from the fact that the debtor was insolvent at the time.

4. ——: ——: ——: **Presumption of Knowledge.** Likewise the law raises a presumption that the preferred creditor had knowledge of the debtor's intention to prefer, from his knowledge of the debtor's insolvency, but this presumption does not relieve the court in trying an issue between the trustee and the creditor as to the validity of the preference received by the latter, of finding the debtor was in fact insolvent at the time.

5. **PRACTICE: Trial Without Jury: Declarations of Law.** The purpose of asking declarations of law in a cause tried without a jury, is to have the legal theory on which the decision was rendered reviewed by the appellate court, and when the trial court refuses a proper declaration of law applicable to an issue in the case, it is prejudicial error.

6. **BANKRUPTCY: Preference: Knowledge of Intent to Prefer: Putting Creditor Upon Inquiry.** In an action by a trustee in bankruptcy to avoid a preference, the rule which, in the absence of direct evidence of knowledge on the part of the preferred creditor that the debtor was insolvent, imputes such knowledge to the creditor, if he had information which would put him upon his inquiry, only requires him to exercise common prudence and ordinary diligence in making his inquiry.

7. ——: ——: ——: **The Inquiry.** A creditor is not held to such presumption where no inquiry he could make would have revealed the insolvency without a minute and searching investigation of the debtor's assets and liabilities, such as making an inventory of the property and listing of the debts.

8. ——: ——: ——: **Insolvency.** It is not sufficient to show that the debtor was unable to meet his bills as they matured and that the preferred creditor did not inquire about his debts to other creditors.

9. ——: ——: **Insolvency.** Under the present bankruptcy law, a person is insolvent when the aggregate of his property at a fair valuation is not sufficient to pay his debts.

10. ——: ——: ——: **Evidence.** In an action by the trustee in bankruptcy to recover preference, the evidence is examined and held insufficient to show a reasonable cause to believe the debtor was insolvent.

Appeal from St. Louis City Circuit Court.—*Hon. R. M. Foster*, Judge.

REVERSED.

*Rassieur & Buder* for appellant.

(1) The court erred in giving the declarations of law asked by plaintiff, because they all proceed upon the erroneous theory that if defendant at the time it received payment of its debt had reasonable cause to believe that the debtor was insolvent, then both the fact of insolvency at the time and knowledge of intention on the part of the debtor to give a preference to the defendant are to be conclusively presumed. Neither Pepperdine v. Bank in 84 Mo. App. 233, and 88 Mo. App. 81 nor Rosenfeld v. Siegfried in 91 Mo. App. 169 is authority for such presumption. Whether the debtor was in fact insolvent and whether the creditor had reasonable cause to believe that he intended to give a preference are independent facts to be determined by the trier of the facts. Pirie v. Trust Co., 182 U. S. 438; Benedict v. Deshel, 11 Am. Bankruptcy Rep. 20; In re Eggert, 102 Fed. 735. (2) The court erred in re-

fusing to give the fourth declaration of law asked by defendant, because the mere fact that Esswein was selling out and that his indebtedness to defendant had been increasing for some time, under the circumstances shown by the evidence, did not put defendant upon inquiry as to Esswein's financial condition.

*A. L. Abbott* for respondent.

(1) Appellants seem to overlook entirely, the fact that intention on the part of the bankrupt is not a fact to be determined by the court. Collier on Bankruptcy (4 Ed.), pp. 418-421. (2) The supreme test of a preference is the effect, that is, the resulting inequality in enabling one creditor to get a greater percentage of his debt than any other creditor. Intent is immaterial, it having given place to the new element resultant inequality. Reasonable cause to believe a preference intended, is a very different thing from intent to prefer, *per se*. Collier, p. 425. A full discussion of what is required in order to recover a preference is given in Hackney v. Raymond Bros.-Clarke Co., 10 Am. B. R. 217; Benedict v. Deshel, 11 Am. B. R. 22, 23; Pirie v. Trust Co., 182 U. S. 438. (3) In a trial before a court without a jury, the same strictness is not required in the instructions as is demanded before a jury. Carpet Co. v. Hatton, 55 Mo. App. 320. And the judgment in such a case should not be reversed because the court fails to declare the law as fully as it might have done. Myers v. Miller, 55 Mo. App. 338. (4) Instructions in such a case are unimportant, save as showing upon what theory the court arrived at the results. Price v. Merritt, 55 Mo. App. 640; Cook v. Farrah, 105 Mo. 508, 16 S. W. 692; Ellis v. Railway, 89 Mo. App. 241; Rice v. Arnold, 58 Mo. App. 97.

STATEMENT.

This is an action by John B. Edwards, as trustee of Anton Esswein, bankrupt, to recover from the

Carondelet Milling Company the proceeds of an alleged preference given to the milling company contrary to the bankrupt law. · Esswein conducted a country store and saloon at Oakville in St. Louis county, about nine miles from St. Louis. On the twenty-fifth day of March, 1902, he owed the milling company $532.88 and the Daniel Paule Mercantile Company $887.19. It is charged that he preferred the mercantile company as well as the milling company, and there is an action to recover that preference. The two cases stand on the same facts. Within a year previous to the date mentioned Esswein had had a partner in his business who drew out of it, and this change in the firm contributed to Esswein's falling behind in the payment of his indebtedness to the two companies, the milling and the mercantile, during the winter of 1901 and 1902. 'No uneasiness was felt on this account, as we gather, and he continued to trade with the concerns, somewhat increasing his indebtedness to both. As he could not meet his bills promptly, he concluded, toward the spring of 1902, to dispose of his stock and business, and conducted a negotiation to that end with Adam Gebhart, through five or six weeks, which finally resulted in a sale. That Esswein was dealing with Gebhart with the intention of selling was known to the mercantile company a month or more before the sale was made and to the milling company two or three days before; but he was not interfered with by either creditor. Those concerns employed salesmen and collectors who travelled regularly certain routes in the county of St. Louis and one of those routes took a salesman from each establishment to Oakville where Esswein was in business. On the morning of March 25, 1902, G. S. Massmann, salesman and collector for the milling company, reached Oakville in the course of his round, called at Esswein's store and asked for some money on the account of Esswein with the milling company. Esswein and Gebhart were engaged at the time

in taking an invoice of the stock of goods pursuant to an agreement that Gebhart would buy the stock and fixtures at their original cost. Esswein told Massmann he would have no money until he had concluded the sale. After some conversation between them an arrangement was made by which Gebhart was to execute his note due in ten days, to the milling company for the amount of Esswein's account and deduct the amount of the note from the purchase price of the stock and fixtures. This was done and Massmann gave a receipt to Esswein. During the same day, but after Massmann's departure, Ed. J. Paule, representing the Paule Mercantile Company, appeared at Esswein's store in the course of his usual trip, and on his asking that his account be paid, Esswein proposed the same settlement he had made with Massmann, which was assented to by Paule and Gebhart and the latter's note taken for the debt. Gebhart subsequently paid both notes. Those transactions were entirely independent of each other and without any concerted action between the two creditors. It further appears that country merchants in that vicinity commonly increased their indebtedness during the winter months and that there was nothing noteworthy about Esswein's delinquency. So far as the evidence discloses Esswein believed he was perfectly solvent and that his stock of merchandise would invoice from $4,000 to $4,500. He stated as much to both Massmann and Paule, said he wanted to pay them and all his creditors and was selling out for that purpose. The stock invoiced only $2,900, falling much below Esswein's expectation. He was adjudged an involuntary bankrupt within four months of the transactions narrated, and the trustee brought this action to recover from the two parties the money they had received from Gebhart on the notes, alleging that the facts show preferences were given within the meaning of the bankrupt law with their knowledge.

We have been unable to ascertain from the record

exactly what Esswein owed, for this reason: part of the property he sold to Gebhart was incumbered with a chattel mortgage for $500. It is stated that he owed $1,220 besides the preferred debts, but whether this $1,200 included the debt secured by the mortgage or was in addition to it is not clear. The amount of the two preferred debts is $1,420.07. If to this be added the $1,220 owed to other creditors and the debt secured by mortgage included in that sum, Esswein owed $2,640.07, or nearly three hundred dollars less than the goods brought. If the secured debt is not included in the $1,200, but is in addition to it, he owed $3,150.07, or $240.07 more than the goods brought. The latter figures are probably correct.

This case was tried without a jury and the court gave these declarations at the instance of the plaintiff and against the objection of the defendant:

"1. The court sitting as a jury declares the law to be that if the defendant, or its officers or agents, or any of them acting for it, had reasonable cause to believe that Anton Esswein, at the time he caused the note of $532.88, executed by Adam Gebhart to be delivered to defendant, was insolvent, then the judgment will be in favor of plaintiff.

"2. And the court sitting as a jury further declares the law to be that it is not essential that the defendant should have actual knowledge or belief in the actual insolvency of said Esswein but that if it, or its officers or agents acting for it, had reasonable cause to believe said Esswein to be insolvent at the time said transfer was made, then the issue should be in favor of plaintiff.

"3. And the court further declares that the defendant had reasonable cause to believe said Esswein was insolvent at the time, if facts and circumstances with respect to Esswein's financial condition were brought home to said defendant or its officers or agents acting for it, such as would put an ordinarily prudent

man on inquiry, for the defendant is charged with knowledge of all the facts which such inquiry should reasonably be expected to disclose.

"4. The court further declares the law to be that if the facts show that defendant, or its officers or agents acting for it, had, at the time of such transfer, such knowledge or information in respect to the financial condition of said Esswein as would put an ordinarily prudent man on inquiry, then the defendant can not escape liability from failing or neglecting to make inquiry."

Declarations setting forth their views as to the theories on which the case ought to be decided were requested by the defendant's counsel and refused. So far as need be we will comment on the rulings on the declarations.

The court found a verdict for the plaintiff, rendered judgment thereon and the defendant appealed to this court.

GOODE, J. (after stating the facts).—One declaration of law requested by the defendant ought to have been given, as it stated the conditions on which the plaintiff was entitled to recover, practically in the language of the bankrupt act. It required findings from the evidence, first; that Esswein was insolvent on March 25, 1902; second, that the defendant, through its agent, had reasonable ground to believe the giving of the Gebhart note in payment of Esswein's debt was intended as a preference. The words "ground to believe" are used in the declaration instead of "cause to believe," the language of the statute; but the two expressions are practically synonymous and the use of the word "ground" has been judicially authorized. Benedict v. Deshel, 177 N. Y. 1; 11 Am. Bankrupt Rep. 20. The declaration could not properly be refused because that word was employed, nor do we detect any other reason for its refusal. It required a finding that

the defendant, or its agent, knew, or had cause to believe Esswein was insolvent; but as to that it was covered substantially by the declaration given for the plaintiff; but the court gave no declaration that a finding that Esswein was insolvent at the time of the alleged preference was essential to a judgment for the plaintiff. We have then a direct refusal to declare that that finding was necessary to avoid the preference, unaided by any declaration or expression authorizing the conclusion that the trial court thought it was necessary. The given declarations required only that the defendant should have had cause to believe him insolvent, without a proviso that he must have been insolvent. The insolvency of Esswein at the time was of the very essence of the plaintiff's right to recover. No preference is voidable at the instance of a trustee in bankruptcy unless it was made when the bankrupt was in fact insolvent, though the preferred creditor may have believed he was. In fact, there can be no preference within the meaning of the bankrupt act, except one given by an insolvent debtor. Bankrupt Act 1898, sec. 60, pars. a and b. Courts have given a rather puzzling construction to the present bankrupt law in respect to whether an *intention* on the part of an insolvent debtor to give a preference must exist in order for the preference to be set aside. It is held that it must be found the preferred creditor knew, or had reasonable cause to believe, the bankrupt intended a preference, but that it need not be found as a fact that the bankrupt did so intend. How a creditor can have knowledge of such an intention on the part of a debtor unless the intention exists, has never been elucidated. The effect of the decisions is to render the requisite intent on the part of a debtor an irrefutable presumption of law from the fact that he was insolvent at the time the preference was given, regardless of whether a preference was in his mind, and, seemingly, regardless of whether he knew or was ignorant of his insolvency. Hackney v.

Linn, 10 Am. Bank. Rep. 213; Benedict v. Deshel, supra. This rule assumes the intention of the insolvent debtor, and in doing so infuses a rather dogmatic spirit into the enforcement of the bankrupt law in regard to vacating preferences. Situations can be called to mind in which a merchant could be insolvent without knowing it. As if some bank where he kept a large account had failed, but he had not learned of the failure when he paid a creditor. But the rule possesses the merit of aiding one essential purpose of the law, namely; preventing creditors from procuring preferences from debtors whom the creditors know to be insolvent. The constraint of the law is thus placed as much on creditors as on debtors. Pirie v. Trust Co., 182 U. S. 438, which is relied on as an authority for the doctrine, does not very pointedly announce it. The question before the court in that case was not whether a trustee could recover the proceeds of a preference, but whether the preferred creditor could prove his demand against the bankrupt's estate. In such a proceeding the intention would be immaterial; because, however innocent the parties might have been in giving and taking the preference, the creditor could not prove a demand for an unpaid balance without surrendering what he had received. The law is quite different when a preferred creditor is sued by a trustee to recover what has been received already in a preferential way; for then the creditor must have had knowledge of the bankrupt's insolvency. But this court holds and has heretofore held, in obedience to the adjudications on the point, that the essential fact to be found in such litigation is not an intent in the mind of the debtor to prefer, but knowledge on the part of the creditor of his debtor's insolvency; the law raising the presumption of the debtor's intent to prefer from the fact that he was insolvent, and presumption of knowledge of his intent by the creditor from the latter's knowledge or cause to know he was insolvent. In Babbitt v. Kelly, 96 Mo.

App. 529, we said: "To invalidate a preference the party benefited or his agent, must have reasonable cause to believe, not that the debtor is insolvent, but that a preference is intended, the act says; but this involves knowledge by the preferred creditor or his agent, or reasonable cause to believe, that the debtor is insolvent at the time of the alleged preferential act; for the essence of a preference denounced by the bankrupt law is that it is given by an insolvent debtor." And so it was ruled in Pirie v. Trust Co., supra, and In re Eggert, 98 Fed. 843.

But the mere fact that the debtor, subsequent to the alleged preference, is declared a bankrupt, does not, we apprehend, relieve a court which is trying an issue between the trustee and a creditor as to the validity of a preference received by the latter, from the necessity of finding the debtor was insolvent when the preference was given. It is not sufficient for the court to find the creditor knew, or had cause to believe the debtor was insolvent, or was in possession of facts sufficient to put him on inquiry about the matter; but the insolvency itself must be found. If, in truth, the debtor was not insolvent, knowledge of facts to excite distrust and inquiry is no basis for avoiding the preference; for in such an instance the inquiry would show solvency and the right to prefer instead of insolvency. The preferred creditor is entitled to have the issue of the debtor's condition determined in an action to which he is a party and is not bound by an adjudication of bankruptcy. This proposition is scarcely gainsaid by plaintiff's counsel. But it is insisted that the refusal of a declaration that it was necessary to find Esswein was insolvent, ought not to be taken as reversible error, because it must be presumed the trial judge understood the necessity of finding he was and so found, though he refused to declare it essential that he should. The argument is advanced, too, that when a trial is without a jury, declarations of law are to be less carefully

scanned than instructions to a jury, and this is true within limits. Expressions employed in declaring the law which might be reversible error as apt to mislead a jury, may be overlooked if there was a court trial. But the point in hand does not relate to loose expressions or misleading language. It goes straight to the opinion the judge held as to his duty. We have no way to ascertain the theory on which he determined the cause except from the rulings on the requests for declarations of law; and that is the approved mode of determining the question. It is the duty of litigants, when a cause is tried without a jury, to ask declarations of law, if they wish to have the legal theory on which the decision was rendered reviewed by an appellate court. Mead v. Spaulding, 94 Mo. 43, 6 S. W. 384. It is said in the case just cited that in actions at law decided by the court only, it is as essential that declarations shall be given and refused as if a jury were used. Again, it was said in Hisey v. Goodwin, 90 Mo. 366, 2 S. W. 566, that a court sitting as a jury should not deny to a party declarations applicable to the facts of the case. This, indeed, is elementary law and needs no support by argument or authority. Very likely the refusal of the declaration in question happened through inadvertence; but it stated sound law and the theory on which the case should have been determined; and as no similar declaration was given, we are constrained to hold prejudicial error occurred. The declaration for the plaintiff went to the limit of the adjudications on the subject, in holding the preference void if the defendant, or its agent, knew facts regarding Esswein's financial condition sufficient to put a prudent man on inquiry as to his solvency. In truth, the trial court's attention appears to have been fixed on the question of the defendant's knowledge or means of knowledge of Esswein's condition, to the exclusion of the issue of whether he was insolvent or not.

The error pointed out necessarily leads to a re-

versal of the judgment; but the proposition arises whether the cause ought to be remanded for a retrial; that is to say, whether there was any evidence tending to prove the defendant, or its agent, knew, or had cause to believe, at the time the account was collected, that Esswein was insolvent. We have attentively studied the testimony regarding the circumstances surrounding the alleged preference with a view to answering this question, which is pressed on us by counsel for the defendant. This being an action at law, if there are in proof substantial facts to support the view of the court below, its decision of the matter is final. After reflecting over the suggestion by plaintiff's counsel of facts likely to produce a belief of Esswein's insolvency in the minds of defendant's officers or agents, or put them on inquiry, we have been unable to discern that any circumstances of that kind existed. In the first place it is a close question whether he was insolvent or not, within the meaning of the present bankrupt law; so close that an inquiring creditor hardly could have satisfied himself without inventorying and valuing all Esswein's property and listing his debts; and no one would assert that such a duty is imposed on a creditor by the bankrupt law before accepting payment of an account. It would be incompatible with the ordinary dispatch of business. No person connected with the defendant company could possibly have known or believed that Esswein was insolvent, except Massmann; and we have been pointed to no fact or circumstance to apprise Massmann that Esswein's property, fairly valued, was insufficient to pay his debts. What is relied on is that he had cause to believe this; knew facts which ought to have put him on inquiry, and, therefore, is presumed to have known what he would have learned by inquiring. As said above, the record does not fairly show what any examination that could, in reason, have been made would have disclosed. A thorough and searching investiga-

tion of Esswein's assets and liabilities might, and probably would, have shown he was insolvent. But was Massmann bound to undertake such a task? The rule that facts to induce inquiry affect one with the knowledge that inquiry would have furnished, must have a reasonable application and does not fit every case wherein notice or knowledge is an issue. At most the rule only requires the party apprised of suggestive facts to exercise common prudence and ordinary diligence in following the clue. Kitchen v. Railroad, 69 Mo. 265; Roan v. Winn, 93 Mo. 503, 4 S. W. 736. It does not impose on him the task of extraordinary and well nigh impossible diligence. Most merchants would refuse to permit a creditor to look their stock through and value it, and certainly such an act would be beyond the ordinary limit of business prudence. Yet this is the only way we perceive by which Massmann could have found Esswein was insolvent. There was no rumor of his insolvency in the community; his creditors were not alarmed; he professed, and evidently believed, he had more goods than would be needed to pay his debts; he paid Massmann and Paule when they made demands of him; told them he was selling out to pay his debts and was able and intended to pay them all. Esswein and Gebhart had been negotiating with the knowledge of Esswein's creditors for six weeks. The sale was conducted in no secret manner, but openly and with the intention on the part of Esswein of meeting his obligations. The latter was selling his stock by invoice; not in bulk. Two facts are principally relied on by the plaintiff to put the defendant in the wrong; that Esswein had fallen behind with his bills, and that Massmann did not ask about his indebtedness to other creditors. It happens that both these facts have been passed on by the national courts in this precise connection and held to be insufficient to invalidate a preference. The decisions on the point were rendered too, under the present bankrupt law; though on the question of a creditor's

reasonable cause to believe his debtor insolvent, the present law is not different from the previous one, and decisions on the previous one are, therefore, still in point; as was decided in the Eggert case, 102 Fed. 735. That case was determined both in the district court and on appeal. It appeared that Eggert, the bankrupt, was indebted to the Rundel-Spence Manufacturing Company in the sum of $1300 for merchandise. In July, 1899, the Rundel-Spence Company adjusted its account with Eggert by allowing him ten per cent discount and accepting an assignment of an account Eggert held against the city of Milwaukee for the sum of $1200 in settlement. Within four months Eggert became a bankrupt and his trustee sued to recover the money the Rundel-Spence Company collected from the city of Milwaukee pursuant to the assignment. There was a finding by the district court that prior to the preference Eggert had failed to meet his obligations to his creditors, and that his default had been reported to an association of plumbers, of which the Rundel-Spence Company was a member; that among other defaults was one to the Rundel-Spence Company itself, which had likewise made a report to said association; that on account of these defaults Eggert was placed on the "cash list" and could no longer obtain credit from any member of the association; that when the Rundel-Spence Company took the assignment of the claim against the city of Milwaukee, it knew Eggert was behind in his payments to creditors and could obtain no further credit, but that fact and the report of it did not indicate that Eggert was insolvent; that the Rundel-Spence Company made no investigation or inquiry before it took the preference as to whether he was solvent or insolvent, and that in obtaining the assignment of the claim against the city of Milwaukee, said company practiced no fraud, deceit nor act of collusion with the bankrupt. This finding of facts by the district court was referred to in the decision of the Court of

Appeals reported in 102 Fed. 735. The district court held the finding was conclusive against the right of the trustees to recover, as it showed the Rundel-Spence Company had no knowledge of the fact that the bankrupt was insolvent and no reasonable cause to believe a preference was intended. It was said in the opinion: "Therefore, findings of knowledge that the bankrupt 'was behind with his payments with his creditors' and that no inquiries were made by the creditor (the one preferred) to ascertain his insolvency, do not affect the liability when followed by the finding that the creditor 'practiced no fraud or deceit, nor did it act in collusion with the bankrupt.'"

In the case at bar there is no indication of fraud or deceit on the part of the defendant, or its agent Massmann, or of collusion with Esswein. The transaction was simply the collection of a debt by an arrangement agreeable to both the debtor and the creditor. The opinion given on the appeal of the Eggert case deals with the distinction between insolvency under the present bankrupt act and under the previous act; pointing out that by the present law a person is insolvent when the aggregate of his property is not, at a fair valuation, sufficient to pay his debts; whereas, under the previous act, insolvency meant an inability to meet obligations as they matured in the ordinary course of business. Esswein was undoubtedly insolvent under the latter rule, as Eggert was; but that rule has no bearing on this case. The opinion of the Court of Appeals further says:

"The facts established are within narrow compass. They are that Eggert was insolvent; that he had failed to meet his obligations promptly as they matured; that, by the rules of the association of which the Rundel-Spence Manufacturing Company was a member, Eggert was not, while such debt remained unprovided for, entitled to purchase goods upon credit,

but only for cash; that the assignment of the claim against the city was not given or received by collusion of debtor and creditor. The finding is somewhat wanting. There is failure to find that Eggert himself was conscious of his insolvency. The aggregate of his assets and liabilities is not given. The only fact brought home to the creditor, and which it is claimed should have aroused inquiry, is that he was somewhat behind in the prompt payment of his obligations. We cannot say, as a conclusion of law, that knowledge of that fact standing alone was sufficient to put the creditor upon inquiry. Indeed, it may be said that a majority of merchants absolutely solvent, in the sense in which the term is employed in the bankrupt act, are not all times able to promptly meet their obligations as they mature. To hold that a creditor receiving payment of or security for a past-due debt is, by the mere fact of knowledge that the debt is past maturity, put upon inquiry of his debtor's inability to pay all his debts, and that under such circumstances he received payment or security at his peril, would be to put at hazard many business transactions and make the act oppressive. The fact of such inability, coupled with other facts and circumstances brought home to the creditor, might be sufficient to put him on inquiry; but this is the only fact from which the deduction is sought that the creditor had reasonable cause to believe his debtor insolvent, and, standing alone, it is insufficient to raise an inference of law that the creditor is chargeable with knowledge of the facts which inquiry would have elicited.''

A leading case on the question of what facts would put a creditor on inquiry as to the solvency of a debtor from whom he is about to take a preference, is Grant v. National Bank, 97 U. S. 80. That case arose on the former statute, but, as was said in the Eggert case, the two statutes are to be construed by the same principles on the point of what is cause to believe a debtor

insolvent. In fact the Grant case is cited in the opinion in the Eggert case as directly in point on that question. The Supreme Court of the United States draws a distinction between cause to *suspect* a debtor is insolvent and cause to *believe* he is; holding the latter circumstance precludes acceptance of a preferential payment, but the former does not. The court said that though a creditor had cause for alarm, and was unwilling to further trust his debtor and anxious to secure his claim, that was not sufficient to impute notice to him of the debtor's insolvency and obtaining payment under such circumstances is legitimate. We cannot quote at length from the opinion, but it is enlightening as to the proper determination of the case at bar. The facts adapted to produce a belief of insolvency were much stronger in the Grant case than in the present one. It does not appear that suspicion existed in the minds of the officers or agent of the milling company regarding the solvency of Esswein. He had been trying for some weeks to sell his store and stock, as was known; yet he was not harassed by either the mercantile or the milling company. It is hard to see how any inference of distrust even can be deduced from the evidence, and certainly no reasonable cause for them to believe Esswein was insolvent was proven.

Guided by the light of the opinions in the Grant and Eggert cases, which are pertinent and instructive, and heeding the admonition therein given against making the bankrupt law an instrument of oppression by setting aside transactions between creditors and debtors on mere suspicion, we feel bound to hold there is no warrant in the record for making the Carondelet Milling Company refund to the trustee in bankruptcy the proceeds of the Gebhart note. The judgment is therefore reversed. All concur.