---

### In re MUIR.

#### (District Court, M. D. Pennsylvania. February, 1914.)

1. BANKRUPTCY (§ 60*)—INVOLUNTARY PROCEEDINGS—APPLICATION FOR RECEIVER.

In involuntary bankruptcy proceedings, findings by the master that the alleged bankrupt, knowing he was in financial distress, prepared a bill for the appointment of a receiver, procured its execution by his largest creditor, had it filed by his own attorney, and, without subpœna, filed an answer admitting the allegations of the bill and joining in the prayer, and that, while the creditor was nominally plaintiff, the application was really made by the debtor, support a conclusion of law that the debtor applied for the appointment of the receiver.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 80; Dec. Dig. § 60.*]

2. BANKRUPTCY (§ 91*)—INVOLUNTARY PROCEEDINGS—INSOLVENCY OF DEBTOR—DETERMINATION.

In such a case, the bill and answer alleging solvency of the debtor, who was insolvent as a matter of fact, amounted to fraud upon the court, and, in an application to have the debtor adjudged bankrupt, the bankrupt court can look beyond the bill and answer to determine whether the debtor was insolvent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 137–139; Dec. Dig. § 91.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. BANKRUPTCY (§ 91*)—INVOLUNTARY PROCEEDINGS—INSOLVENCY OF DEBTOR—DETERMINATION.

Where the decree of the court appointing a receiver is silent as to the reason for the appointment, the other papers in the case may be consulted or evidence aliunde produced in involuntary bankruptcy proceedings to determine the reason for the appointment.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 137–139; Dec. Dig. § 91.*]

4. BANKRUPTCY (§ 60*)—INVOLUNTARY PROCEEDINGS—INSOLVENCY OF DEBTOR—DETERMINATION.

Under Bankr. Act July 1, 1898, c. 541, § 3a (4), 30 Stat. 546 (U. S. Comp. St. 1901, p. 3422), as amended by Act Feb. 5, 1903, c. 487, § 2, 32 Stat. 797 (U. S. Comp. St. Supp. 1911, p. 1493), providing that one who, being insolvent, applied for a receiver for his property, is a bankrupt, the charge of insolvency is one to be determined by the bankruptcy court.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 80; Dec. Dig. § 60.*]

5. BANKRUPTCY (§ 60*)—INVOLUNTARY PROCEEDINGS—INSOLVENCY OF DEBTOR—DETERMINATION.

Where the defendant in proceedings for the appointment of a receiver was the real plaintiff also, hiding behind the nominal plaintiff, there was no cause before the court, and the proceedings did not prevent the bankruptcy court from determining the issue of insolvency at the time the application for the receiver was made.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 80; Dec. Dig. § 60.*]

6. BANKRUPTCY (§ 57*)—INVOLUNTARY PROCEEDINGS—ACTS OF BANKRUPTCY—INTENT OF BANKRUPT.

Under Bankr. Act July 1, 1898, c. 541, § 3, 30 Stat. 546 (U. S. Comp. St. 1901, p. 3422), as amended by Act Feb. 5, 1903, c. 487, § 2, 32 Stat. 797 (U. S. Comp. St. Supp. 1911, p. 1493), defining acts of bankruptcy, it is not necessary that the intent be to hinder, delay, and defraud creditors; it being sufficient if there be either intent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 57, 66, 69–79; Dec. Dig. § 57.*]

7. BANKRUPTCY (§ 57*)—INVOLUNTARY PROCEEDINGS—"TRANSFER."

One who, being insolvent, applies to the court for the appointment of a receiver for personal property, transfers his property within the meaning of Bankr. Act July 1, 1898, c. 541, § 1 (25), 30 Stat. 545 (U. S. Comp. St. 1901, p. 3420), defining "transfer" to include the sale and every other and different mode of disposing of or parting with property or the possession of property absolutely or conditionally.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 57, 66, 69–79; Dec. Dig. § 57.*

For other definitions, see Words and Phrases, vol. 8, pp. 7064–7070, 7819.]

8. BANKRUPTCY (§ 91*) — INVOLUNTARY PROCEEDINGS — SUFFICIENCY OF EVIDENCE—INTENT TO DELAY CREDITORS.

Upon an application for involuntary bankruptcy, evidence *held* to show that the debtor procured the appointment of a receiver with intent to delay his creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 137–139; Dec. Dig. § 91.*]

9. BANKRUPTCY (§ 60*)—INVOLUNTARY PROCEEDINGS—ACTS OF BANKRUPTCY—ASSIGNMENT FOR BENEFIT OF CREDITORS.

Where an application for a receiver, which was nominally filed by a creditor, was really the application of the debtor, who by his answer

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

joined in the prayer that the property be sold and, after payment of the costs, the proceeds be divided among the creditors, the surplus, if any, to be paid to the creditor, such application amounted to an assignment by the debtor for the benefit of creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 80; Dec. Dig. § 60.*]

In Bankruptcy. Petition for the involuntary bankruptcy of George H. Muir. On exceptions to the report of the special master, the said George H. Muir was adjudicated a bankrupt. Exceptions overruled.

Seth T. McCormick and C. L. Peaslee, both of Williamsport, Pa., for receiver.

Geo. E. Sands, of Williamsport, Pa., for bankrupt.

A. R. Jackson and M. C. Rhone, both of Williamsport, Pa., for creditors.

WITMER, District Judge. On the 8th day of July, 1913, eight of George H. Muir's creditors filed a petition in bankruptcy against him in this court asking for his adjudication. The petition charges: (1) That within four months preceding the filing of the petition, while insolvent, the alleged bankrupt applied to this court, in equity, for the appointment of a receiver to take charge of, hold, administer, and distribute Muir's property; (2) that within four months preceding the filing of the petition in bankruptcy a receiver was appointed on the equity side of this court, because of insolvency, who was put in charge of the property of the alleged bankrupt; (3) that within four months preceding the filing of the involuntary petition, Muir, while insolvent, made a transfer of his property with intent to hinder, delay, and defraud his creditors; (4) that within four months preceding the filing of the bankruptcy petition Muir conveyed and transferred to the Northern Central Trust Company, a creditor (also the receiver), all his property with intent to prefer the said trust company over his other creditors; (5) that within four months of the filing of the bankruptcy petition Muir made a general assignment for the benefit of his creditors.

To this petition the alleged bankrupt filed an answer denying the commission of any of the alleged acts of bankruptcy, averring that he ought not to be declared a bankrupt, and praying inquiry by the court. The issue thus raised was referred to Arthur A. Smith, Esq., referee in bankruptcy, as special master.

The special master found for the creditors on the first charge, for the bankrupt on the fourth charge, and submitted to this court whether the second, third, and fifth charges were established, under the facts found, should it become necessary to consider them. The report was excepted to and is now before us for consideration.

From the record in the equity case and the oral testimony taken before the master, the master reports the following findings of fact:

"1. That an involuntary petition in bankruptcy was filed against George H. Muir, on July 9, 1913, by eight creditors to whom he owed debts exceeding $500. That for more than six months preceding the filing of the petition he resided, and had his principal place of business, in the city of Williamsport,

said district, and that at said time he was neither a wage-earner, nor principally engaged in farming, or tilling the soil.

"2. That on the 25th day of July, 1913, Muir filed his answer to said petition, in which he denies 'that he has committed each and every act of bankruptcy set forth in said petition, or that he is insolvent.'

"3. The oral testimony taken before me clearly shows that on July 1, 1913, when the receiver was appointed in the equity case, Muir was insolvent, the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed or removed, or permitted to have been concealed or removed, with intent to hinder, delay, and defraud his creditors, is not sufficient, at a fair valuation, in amount to pay his debts. His assets on that day consisted of stocks of merchandise and fixtures contained in three stores, located at Williamsport, Muncy, and Jersey Shore in said district, which were appraised by the receiver's appraisers, and who valued and appraised the same at $21,177.53. Out of the sale of said stock and fixtures, the receiver has realized $16,379.16. On July 1, 1913, Muir owed debts to the amount of $26,768.11, made up as follows: For merchandise, $16,651.05; notes in bank, $8,000; miscellaneous debts, $2,117.06.

"4. That for some time prior to July 1, 1913, Muir knew he was in financial distress and had frequently discussed the matter with his attorney. That finally they determined upon having a receiver appointed, and the Northern Central Trust Company, of Williamsport, was agreed upon by them.

"5. That upon June 28, 1913, Muir wrote a letter to Burton, Price & Co. of New York City, his largest creditor, for a conference, and not receiving a reply thereto, upon June 30th, he sent a telegram to T. N. Price of said firm to 'kindly wire answer to letter of the 28th.' That in response thereto, Mr. Price met Muir and one of his attorneys, Mr. Sands, who, on July 1, 1913, journeyed from Williamsport to New York City, a distance of 300 miles, taking with them the bill in this equity proceeding which had already been prepared by Muir's attorneys for execution by Burton, Price & Co.

"6. That at said interview, Muir and his counsel stated to T. N. Price of said firm that certain of Muir's creditors were pressing him for payment, and that unless a receiver were appointed bankruptcy would probably follow. That if a receivership could be had, 'time would be gained,' and that Muir 'might be able to pull through.' Whereupon, after solicitation and the urgent appeal and request of Muir and his counsel, Mr. Price, of Burton, Price & Co., signed and executed the bill in equity; after which Muir's attorney took it into his possession and at once returned with it to Williamsport.

"7. That upon July 1, 1913, as appears by the jurat thereto, Muir executed his answer to said bill without the issuing of a subpœna, which, with the bill, was presented to the court by Mr. Peaslee, and the Northern Central Trust Company was appointed receiver.

"8. That in his answer, Muir admitted all the allegations contained in the bill to be true, and joined 'in the prayer of the plaintiff and desires that suitable receiver or receivers for his property may be appointed by this honorable court, as prayed for in plaintiff's bill.'

"9. That Burton, Price & Co. would not have executed the bill of complainant filed in the equity case, had it not been for the statements made by Muir and his attorney to Mr. Price, and their appeal, request, and solicitation that he execute the same. That it was wholly due to the solicitation and statements of Muir and his attorney that Mr. Price executed the bill, and that they had no thought of instituting proceedings against Muir and would not have voluntarily presented the bill and had the receiver appointed.

"10. That when Muir stated in his answer to the bill that his assets exceeded his liabilities, he either intentionally misrepresented his true financial condition to the court, or else he wholly neglected his duty to ascertain the truth, which could easily have been done by an examination of his books.

"11. That the reason Muir solicited Burton, Price & Co. to execute the bill, as Muir and his attorney testified, was because of lack of cash to meet maturing obligations, threatened suits, inability to pay debts, prevent suits by creditors, and gain time.

"12. That while it appears from the records in the equity receivership that Burton, Price & Co. are the nominal plaintiffs in the bill, the application

for the receiver was really made by Muir, who, together with his attorneys, planned the whole proceedings.

"13. That the decree appointing the receiver, which was prepared by Muir's attorney, is silent as to the reason for the appointment; but the prayer of the bill is, in substance, that a receiver be appointed to take possession of the property and assets of Muir and administer the same under the order of the court; that the defendant (Muir) be enjoined from interfering in the business; that the receiver be authorized to continue the business and that the proceeds of the sale of the property, after payment of costs and the disbursements of the suit and of the receivership, be divided among the creditors of Muir, and the residue, if any, be paid to Muir."

No exceptions were filed by the petitioning creditors or the bankrupt to these findings of fact. However, the creditors filed exceptions, complaining that the master erred in not finding in their favor on the second, third, and fifth charges.

[1] 1. Upon findings of fact Nos. 4, 5, 6, 7, 8, 9, and 12, the master was justified in concluding that Muir did, upon the 1st day of July, 1913, apply to this court for a receiver in equity for his property. The findings upon which this conclusion is based are not excepted to, and the conclusion follows, irresistibly, as a logical deduction from the fact so found. The learned master well says:

"The records in the equity case would indicate that Burton, Price & Co. are the plaintiffs; but the reasons for, and the manner in which they were led into, signing the bill are of much value in determining the point at issue. It appears that on a number of occasions prior to July 1, 1913, Muir consulted his attorney, Mr. Peaslee, with reference to his financial condition, who advised him with respect thereto; and finally it was agreed that a receiver for his property should be secured, and they decided upon the Northern Central Trust Company; after which his largest creditor, plaintiffs in the equity case, was selected as the person to make application to the court for the appointment of the receiver. The machinery was then put into motion to reach this creditor and prevail upon them to execute the bill of complainant, Muir at once got busy, and on June 28, 1913, wrote a letter to Burton, Price & Co. of New York City, for an interview, and when no answer came in response to the letter, on June 30th, he telegraphed T. N. Price of that firm for an interview; which was granted, and on July 1, 1913, Muir, accompanied by his attorney, Mr. Sands, journeyed to New York City, where they met Mr. Price and after an interview of about two hours Mr. Price, on behalf of his firm, executed the bill. * * * After the execution of the bill, Muir and his attorney returned to Williamsport, bringing with them the bill, which together with Muir's answer was placed in the hands of Mr. Peaslee, who represented the papers to the court for the appointment of the receiver. Mr. Price had never met Muir nor Sands until the trip to New York City; and he states that he never employed Mr. Peaslee to file the bill, unless the signing of the bill was an employment; that he was told that there would be no costs to him; that he would not have signed it had it not been for the representations and solicitations of Muir and his attorney.

"Another fact in the case, the execution by Muir of his answer to the bill, its contents, and method of filing, throw much light on the question under consideration. The answer purports to have been signed and executed on July 1, 1913, when Muir was in New York City; the oath to the same having been taken that day in Williamsport. It was placed in the hands of one of Muir's attorneys, who now appears for Burton, Price & Co. and is filed in court on the same day as the bill. No subpoena is issued; but a rush is made to have the receiver appointed. In his answer he alleged that his assets are in excess of his liabilities to the exact amount as set forth in the bill, confesses the facts and allegations contained in the bill to be true, and joins in the prayer of the plaintiffs that a suitable receiver be appointed for his property. In addition, Mr. Sands, one of Muir's attorneys, throws more light on the reason the receiver was applied for, viz., for the purpose of

gaining time and to prevent other creditors from collecting their claims by suit."

This statement by the master is as fair to the alleged bankrupt as it is possible to make it. It justifies the conclusion that:

"The scheme here carried into effect was prearranged and worked out by Muir and his attorneys before the trip to New York City, and that they put the machinery in motion to carry out their scheme by having the plaintiff in the bill nominally apply for the receiver."

[2] The conclusion that Muir was the real actor and plaintiff cannot be avoided. There was no doubt in the mind of the master, nor is there any in the mind of the court, that Muir procured the appointment of the receiver. In doing this it is clear that he perpetrated a fraud upon the court. He concealed the fact of his insolvency, when he must have known such was his financial condition.

Having found that Muir was the actor and procured the appointment of this receiver in equity, it would be a travesty upon justice to say that this court in passing upon the question of insolvency must be confined to the bill and answer. They were fraudulent, and it would be strange indeed to say that the court cannot protect itself against fraud. Under the circumstances, Muir having been the real plaintiff and the actual defendant, this court may look beyond the bill and the answer to determine whether Muir was actually insolvent at the time he procured the appointment of the receiver. The master in his third finding of fact has ascertained that on the 1st day of July, 1913, Muir was insolvent. In the tenth finding of fact the master concludes that:

Muir "either intentionally misrepresented his true financial condition to the court, or else he wholly neglected his duty to ascertain the truth which could easily have been done by an examination of his books."

Upon careful consideration, I concur in this, and now hold that within four months preceding the filing of the petition, while insolvent, Muir applied to this court, in equity, for the appointment of a receiver to take charge of, hold, administer, and distribute his property.

[3] The decree of the court is silent as to the reason the receiver was appointed, and in such case the papers in the case may be consulted, or evidence aliunde may be produced. Davis v. Brown, 94 U. S. 429, 24 L. Ed. 204; Russell v. Place, 94 U. S. 608, 24 L. Ed. 214; Hooks v. Aldridge (C. C. A. 5th Cir.) 16 Am. Bankr. Rep. 662, 145 Fed. 865, 76 C. C. A. 409; In re Kennedy Tailoring Co. (D. C. Tenn.) 23 Am. Bankr. Rep. 656, 175 Fed. 871.

[4] It certainly cannot be the law that because Muir, both plaintiff and defendant, drawing both the bill and answer, had so skillfully drawn the papers as that we cannot point to the "insolvency" as apparent from the fact of the proceedings, we are bound thereby and cannot determine the question upon evidence aliunde. Under the second clause of section 3a(4) of the Bankruptcy Act, the charge of "insolvency" is an issue to be determined in the bankruptcy court.

[5] If Muir was the real plaintiff in the equity case, lurking in the shadow of Burton, Price & Co., the nominal plaintiff, and it also ap-

pears from the record in the equity case that Muir is the actual defendant, there was no real cause before the court in the equity case for adjudication. A party cannot be both plaintiff and defendant, yet such is the effect of the equity proceedings, under the facts. If there was no real cause depending before the court in the equity suit, there is surely nothing in the way of this court in determining "insolvency."

2. It is not necessary, and the court does not undertake, to decide whether the receiver in equity was actually appointed on the basis of "insolvency," upon the face of the pleadings therein.

3. Did Muir by procuring the appointment of the receiver in equity, within four months preceding the filing of the involuntary petition, while insolvent, make a transfer of his property with intent to hinder, delay, and defraud his creditors? This question the master has failed to answer. It has already been decided that Muir procured the appointment of the receiver and that he did so while insolvent.

It remains therefore for us to consider and determine: (a) Whether there was a transfer of Muir's property accomplished by the receivership; and (b) whether there was the intent to hinder, delay, and defraud creditors thereby.

[6] It is not necessary since the amendment of February 5, 1903, that it be to hinder, delay, and defraud. It is sufficient if it be with either intent.

[7] Section 1 (25) of the Bankruptcy Act defines the word "transfer" to "include the sale and every other and different mode of disposing of or parting with property or the possession of property, absolutely or conditionally." Said the Supreme Court of the United States in Pirie, etc., v. Chicago Title & Trust Co., 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171, 5 Am. Bankr. Rep. 814:

" 'Transfer' is defined to be not only the sale of property, but 'every other mode of disposing or parting with property.' All technicality and narrowness of meaning is precluded. The word is used in its most comprehensive sense, and is intended to include every means and manner by which property can pass from the ownership and possession of another, and by which the result forbidden by the statute may be accomplished."

We have already decided that Muir procured the receivership. In general, the effect of the appointment of a receiver is to remove the parties to the suit from the possession of the property, notwithstanding the right to the property is in no way affected, and he over whose property a receiver has been appointed has no authority thereafter to subject it to any legal liability in the hands of the receiver, or to deal with it in any manner which operates as an interference with the receiver's possession. 34 Cyc. 183, 184. The mere order appointing a receiver of property does not transfer the ownership of or legal title to the property over which he is appointed, without statutory provision to that effect, or where the appointment is pursuant to the general powers of the court and the usual practice in chancery as distinguished from an appointment under statutory provisions conferring special powers and rights. 34 Cyc. 184, 185, and cases cited. Without going into the question of where the title is, upon receivership, at law, the rule is laid down that:

"In equity, however, it is held that an order for a receiver, when his appointment is completed, vests in him all the property and effects subject to the order without an assignment, although as to the legal title to real estate a transfer has been held indispensable." 34 Cyc. 186.

There was no real estate affected by this receivership, and we are of the opinion that title to the personalty vested in the receiver. At any rate, the receiver acquired thereby the possession thereof.

"The general proposition is well established that, the receiver being the officer or agent of the court from which he derives his appointment, his possession is exclusively the possession of the court; the property being regarded as in the custody of the law, in gremio legis, for the benefit of whoever may be ultimately determined to be entitled thereto." High on Receivers (4th Ed.) § 134, p. 153.

There is no question but that this comes within the very language of section 1 (25) of the Bankruptcy Act above quoted. We conclude therefore that the receivership was a transfer.

[8] Was the intent present to "hinder, delay or defraud creditors"? The master quotes from the evidence of Muir, page 33 of the record:

"Q. Did you suggest the appointment of the Northern Central Trust Company as receiver, or was it suggested to you? A. I think it was talked over who we should get with Mr. Peaslee, and Mr. Sands and Mr. Muir.

"Q. And you picked on the Northern Central Trust Company? A. Yes, sir."

Page 58 of the record appears:

"Q. How long prior to July 1st had your financial condition been such that you could not pay your bills as they matured? A. We had bills coming due, and I talked the matter over with Mr. Peaslee and let him look it over, and I was in hopes to pull through, and he said: 'It looks better and you will pull through, but if the worst comes to the worst, we will have to do something, but I think it will pull through.' So I went back and took off my coat and went to work, and thought I would be able to pull through.

"Q. Had that been the condition for some time before the 1st of July? A. Yes, it had been."

Page 63 of the record, Mr. Sands, one of Muir's attorneys, testified as follows:

"Q. Of course, as a lawyer, you knew as soon as receivership was in charge of Muir's property, one appointed by the United States court under this equity proceeding, that no creditor could collect his claim by execution? A. Yes, sir; that was my understanding of the law."

Page 64 of record, Mr. Sands testifies:

"Q. Then you tell us what the purpose was (in filing this bill in equity) you have given us some of the details surrounding the transaction? A. Mr. Muir was being harassed by a number of small creditors he was unable to pay at the time—the purpose was to gain a little time. He thought in a short time he would be able to pay them, but they were pressing so hard he could not pay them at that time.

"Q. In other words, he would gain some time by the equity proceedings? A. Yes, that would be the result of it."

The master says, after quoting this evidence:

"It is equally clear that his (Muir's) purpose was to delay his creditors."

We agree with him. In re Bininger, Fed. Cas. No. 1,420, 3 Fed. Cas. at page 417, it is said:

"The design and purpose of the bankruptcy law is that the property of an insolvent shall be secured to their creditors in the very mode pointed out thereby, with all the facilities for its appropriation, all the security for its administration, all the safeguards against fraud, all the protection against devices to establish false claims, fictitious debts, and illegal or inequitable preferences, which that act provides, and in the summary manner in which the proceedings may be conducted. It is not, therefore, for the debtors or for the debtors and some of the creditors to say, we can devise a better or safer or more economical mode for reaching the same final result. If it were true, it would be only saying, we will resort to an expedient to defeat the bankruptcy law, and our reason therefor is that we think our plan is wiser and better than that which Congress has seen fit to prescribe. But the administration of the property under a receiver in such a suit does not necessarily accomplish the same result."

The court further says:

"It seems hardly necessary to add that the taking of the property by a receiver for administration delays the operation of the act. * * * A proceeding which must pass through all the ordinary forms of litigation, and which is susceptible of almost indefinite protraction, through orders, appeals, rehearings, etc., is substituted for the summary proceedings which the act of Congress provides."

This case was decided under the federal act of 1867 (chapter 176, 14 Stat. 517), but it applies to the act under consideration. The creditors of Muir, by this receivership, were deprived of all the securities of the Bankruptcy Act for the administration of his estate. They were deprived of all the safeguards of that act against fraud and devices to establish false claims, fictitious debts, and illegal and inequitable preference. They were deprived of the right to examine the election of a trustee. Whether Muir, at the time of the receiver's appointment, had the specific intent to hinder, delay, or defraud, can only be determined upon the facts of the case as developed by the evidence. He induced and procured the chancellor in equity to do that which he could not do himself without bringing himself within the purview of the Bankruptcy Act, and this he did by perpetrating a fraud upon the chancellor. He was the actor in the bill for receivership, hiding behind Burton, Price & Co. He prepared the facts alleged in the bill. He prepared his answer to his own bill, and in both bill and answer fails to give the chancellor his true financial status. The master well says in his tenth finding of fact:

"He either intentionally misrepresented his true financial condition to the court, or else he wholly neglected his duty to ascertain the truth, which he could easily have done by an examination of his books."

To our mind, this is sufficient to justify the conclusion that Muir intended to hinder, delay, and defraud his creditors. This result followed in the train of what he did and did not do. We are of opinion therefore that Muir did, by procuring the appointment of the receiver within four months preceding the filing of the petition in bankruptcy, while insolvent, make a transfer of his property with intent to hinder, delay, or defraud his creditors.

4. The fourth charge of bankruptcy contained in the petition, to wit, that within four months preceding the filing of the bankruptcy petition Muir conveyed and transferred to the Northern Central Trust Company, a creditor, all his property with intent to prefer the said trust company over his other creditors, was, as heretofore stated, found in favor of the bankrupt and needs no further consideration.

[9] 5. Did Muir, within four months of the filing of the bankruptcy petition, make a general assignment for the benefit of his creditors? The prayer in the bill in equity is as follows:

"A decree that the proceeds of any sale under the direction of this court after the payment of costs and disbursements of this suit and the lawful charges and expenses of the receiver or receivers appointed therein may be divided among the creditors of the said defendant in equity according to their respective rights and the residue, if any, to the said defendant as their respective interests may appear."

The creditors rely upon this prayer, in which Muir joined by his answer, as justifying a finding in their favor on the fifth charge. We have already found that Muir was the real actor in the appointment of the receiver, that it was his bill. It therefore follows that this prayer above quoted belongs to him. It is his in the bill, and he made it his by his answer. We have already found that Muir did make a transfer of all his property, by procuring the appointment of the receiver, under the facts of this case. Under the prayer above quoted, doubly that of Muir, all his property was to be disposed of by the receiver for the benefit of (1) Muir's creditors and (2) Muir's own benefit, if any was left after satisfying creditors.

"An assignment for the benefit of creditors is well defined to be a transfer by a debtor of some or all of his property to an assignee in trust, to apply the same, or the proceeds thereof, to the payment of some or all of his debts, and to return the surplus, if any, to the debtor." 4 Cyc. 120.

Having found that Muir procured the appointment of a receiver, thereby effecting a transfer of all his property to such receiver in trust, to apply the same, or the proceeds thereof, (1) to his creditors, and (2) to return the surplus, if any, to Muir, it is clear that the fifth charge of bankruptcy must be found for the petitioning creditors.

It follows therefore that, the said George H. Muir having committed several of the acts of bankruptcy charged, he is accordingly now adjudicated a bankrupt as provided by law.