### In re BULLOCK et al.

#### (District Court, E. D. North Carolina. June 18, 1902.)

1. BANKRUPTCY—PREFERENCES—PAYMENT OF NOTES TO INDORSEE.

    Where a debtor closed his commercial account with a creditor by giving negotiable notes, which the creditor sold and indorsed to a bank, the payment of some of such notes to the indorsee by the debtor while insolvent, and within four months prior to his bankruptcy, is not a preferential payment to the payee, which he must surrender before proving a debt against the estate in bankruptcy, although such debt includes another note of the same series, which the creditor was compelled to take up from the bank on his indorsement, on default by the maker.

In Bankruptcy. On question certified from referee.

F. A. Daniels, for claimant.
F. A. Woodard, for trustee and creditors.

PURNELL, District Judge. Bullock Bros. & Boykin were adjudicated bankrupts on their own petition on October 28, 1901, and a debt of $1,956.13 appears as due the Baltimore Bargain House, unsecured. From the certified record of the referee, it appears a dividend of $334.91 was declared on this claim April 21, 1902. The trustee and creditors claim said dividend should not be paid, because said Baltimore Bargain House had received payments on their claim within four months, and, as said Baltimore Bargain House had refused to comply with the demand of the trustee to refund such payments, the dividend should be returned to the assets of the estate. After due notice to file further evidence, the creditor, the Baltimore Bargain House, filed two affidavits, which the referee ruled as insufficient, and the dividend on this creditor's claim should be returned to the assets of the estate. Thereupon said creditor asked the record to be certified to the judge for review.

The facts appear to be that Bullock Bros. & Boykin, on April 25, 1901, were indebted to the Baltimore Bargain House for goods purchased, aggregating about $480, for which they executed three several notes. One of these notes, due five months after date (April 25, 1901),

for $160, was filed as a part of the schedule, claimed and as indorsed by the Baltimore Bargain House, Jacob Epstein, per Nathan Epstein. There are several rubber stamp indorsements on this note, showing it passed through the Howard National Bank of Baltimore, William H. Roberts, cashier, the Bank of Commerce, Norfolk, the City National Bank, Greensboro, N. C., and returned September 28, 1901. After the execution of these notes, the Baltimore Bargain House sold to the bankrupt bills of merchandise, amounting to $1,540.47. Two checks of Bullock Bros. & Boykin are filed as exhibits with the affidavits,—one July 29, 1901, No. 9, for $162.48, the other August 28, 1901, No. 36, for $163.28,—by which it is said the two notes not now filed were paid. The proof filed as to this claim is, first, the affidavit of William H. Roberts, Jr., who makes affidavit that he is cashier of the Howard National Bank of Baltimore, Md., and that on the 19th day of June, 1901, he purchased from Jacob Epstein, trading as Baltimore Bargain House, the following promissory notes, for the sums as follows, and obtained thereby all right, title, and interest in and to the said promissory notes aforesaid, viz.: note dated April 25, 1901, for $162.48, three months; note dated April 25, 1901, for $163.28, four months; and the affidavit of Jacob Epstein of May 1, 1901, in which he makes oath that he trades in Baltimore city under the style of the Baltimore Bargain House, and sold goods, "as per proven accounts," to the bankrupt firm of Bullock Bros. & Boykin, and that he has received no money from said Bullock Bros. & Boykin on account of his claim as proven therein; and the alleged payments of July 29th and August 28th of $162.48 and $163.28, respectively, were not made to him, and no one in his behalf, but prior thereto, on the 20th day of June, 1901, that he sold to the Howard National Bank, for the sum of $323.84, all his right, title, and interest in and to certain promissory notes drawn by Bullock Bros. & Boykin to the Baltimore Bargain House, dated, respectively, April 25, 1901, and payable three and four months after date, respectively, for the amounts above mentioned, and that he has no knowledge whether or not said notes have been paid. This is all the proof.

Counsel in their argument read from an account book, said to be the ledger of Bullock Bros. & Boykin, which it was claimed showed that the payment of the two notes referred to above was charged to the account of the Baltimore Bargain House, but this does not amount to evidence, since it is in no way supported by oath, and cannot be binding upon any one except the bankrupts themselves. It does not therefore demand serious consideration. The purpose of closing an account, in a commercial transaction, by giving a note or notes therefor, is to put it in the shape of a negotiable paper, which can be used by the creditor. It is his property, and he can dispose of it by sale or assignment. Where he simply assigns it, he is no longer a creditor, but is security for the original obligor to the assignee. By these transactions the form of the debt is entirely changed. The original creditor becomes a surety for his debtor, and is no longer a creditor. This is what may be called hornbook law. The account was closed and the notes executed therefor six months prior to the adjudication. The notes if the affidavits are to be believed,—and there is no evidence

to the contrary except bare assertion,—were sold and assigned four months and nine days before the adjudication. Neither within the four months prescribed by the bankrupt law. The payments were made within the four months, but the payments were to the new creditor, the assignee, not to the Baltimore Bargain House, the original creditor. True, the third note appears to have been assigned, returned unpaid, and taken up by the indorser, the Baltimore Bargain House, and from these indorsements it might be said this note was deposited for collection only, but this inference—for it is not evidence —is aliunde the other two notes, to which affidavits apply. The indorsement is in blank, and such indorsements are for all purposes, and it may be said this note was also sold; but the indorser, having become surety, had a perfect right to pay the note when it was not paid by the principal. In fact he was liable on the note as surety, and could, under the circumstances, have been made to pay it.

The decision of the supreme court in Pirie v. Trust Co., 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171, has no application to the case at bar. In that case the original creditor still held the claim, to whom within four months prior to the adjudication the payments were made, and the bankrupt was hopelessly insolvent. In the case at bar there is no evidence of insolvency at the time the notes were given and assigned, nor at the time the payments were made, and the payments were not made to the original creditor. The Howard National Bank is not offering to prove a claim, but seems to have been paid. This may all be a shrewd commercial trick, as argued by counsel, but the court has no evidence that such is the case, and must decide upon evidence, not upon suggestion or intimation. The paper was negotiable,—three independent notes. They were sold and assigned. This constitutes a legitimate commercial transaction. The referee is therefore reversed in holding that the payment of the two notes to the Howard National Bank, to which the same had been assigned, was a preference to the Baltimore Bargain House. As to the third note, the one now claimed, and filed with the other claims of the Baltimore Bargain House, it is now the property of the Baltimore Bargain House, and is not affected by any transactions touching other notes, and will share in the distribution of the assets of the estate as first allowed by the referee.

The objections of the trustee and creditors are overruled.