Complainant seeks to set aside a mortgage executed by a bankrupt within the four months' period prior to the adjudication in bankruptcy.
On April 17th, 1933, Edward W. Wills was adjudicated a bankrupt and thereafter complainant was appointed trustee of the bankupt's estate and qualified as such. Thereafter complainant, as trustee in bankruptcy, filed his bill of complaint seeking to set aside a certain mortgage executed and *Page 294 
delivered by the bankrupt to the defendant, said mortgage having been so executed and delivered within four months of the adjudication in bankruptcy, to wit, on December 31st, 1932.
The mortgage in question is in the sum of $7,547.08 and was given to the defendant to secure the payment of pre-existing loans made by the defendant to the bankrupt, and as security for which loans the defendant, at the time of the execution and delivery of the mortgage, had the bankrupt's three separate promissory notes, which notes were further secured by bank stock collateral at the time of the execution and delivery of the mortgage.
Complainant, in his brief, asserts "a trustee in bankruptcy is entitled under the Bankruptcy act to recover a transfer of property if the following circumstances concur:
1. That a transfer of a property of the debtor has taken place.
2. That the debtor at the time of the transfer was insolvent.
3. That the transfer was made within four months before the filing of the petition in bankruptcy, or after the filing and before the adjudication.
4. The transfer must enable the creditor to obtain a greater percentage of his debt than other creditors of the same class.
5. The person receiving it must have had reasonable cause to believe that the enforcement of the transfer would effect a preference."
The defendant agrees with the complainant in the statement of the law above set forth, and authorities are in accord therewith.
I will take up in their order each one of the propositions requisite in order that the relief prayed for in the bill of complaint may be granted.
It is admitted that a transfer of the property of the debtor took place when the debtor executed and delivered to the defendant the mortgage in question.
Was the debtor insolvent at the time of transfer? Not — Did the defendant know or have reasonable ground to believe *Page 295 
that he was — but — Was he, in fact, insolvent, irrespective of what the defendant may have believed his condition to be?
At the time of the execution and delivery of the mortgage in question, the debtor was possessed of certain bank stock, the value of which is not in dispute. That bank stock was hypothecated as collateral for loans made to the bankrupt. In addition to the bank stock, the bankrupt was possessed of real estate, the value of which is in dispute. Defendant was permitted to qualify as an expert on real estate values from the experience gained in a long and active practice of law in Atlantic City, but did not call any other witnesses to testify as to the values of the bankrupt's real estate as of the date of the mortgage. Complainant produced two realtors who have been actively engaged in the real estate business in Atlantic City for many years and they testified as to their idea of the value of the real estate as of the date of the mortgage. I am of the opinion that the values as testified to by the witnesses for the complainant are the values which I must accept, on this branch of the case, rather than those given by the defendant. I come to this conclusion after a careful consideration of the qualifications of the defendant and those of the two witnesses for complainant and am satisfied that the complainant's testimony preponderates over that of the defendant, so that I come to the conclusion, taking complainant's value of the real estate, and taking the other evidence into consideration, that the bankrupt was insolvent on the date of the execution of the mortgage to the defendant. This conclusion is fortified by the testimony of the bankrupt, who said at the hearing that substantially all of his liabilities, as shown on the bankruptcy schedule, existed at the time of the execution and delivery of the mortgage, with the exception of assessments on national bank stock and a few minor items, and if this is so, and there is no denial that it is true, an inspection of the schedule clearly demonstrates that the bankrupt was insolvent as of the date of the mortgage.
I will take up the question of defendant's knowledge of the financial position of Mr. Wills later. *Page 296 
It is admitted that the transfer was made within four months of the adjudication in bankruptcy, and it clearly appears that if the transfer stands the defendant will obtain a greater percentage of his debt than other creditors of the same class, by reason of the fact that the mortgage would be first paid out of the proceeds of the sale of the real estate.
The only question remaining for consideration is: Did the defendant, at the time of the execution and delivery of the mortgage, have reasonable cause to believe that that transaction would effect a preference?
Defendant insists that at the time of the execution of the mortgage he believed Wills to be solvent and that he realized that by the execution of the mortgage he was getting a priority, but that he did not contemplate a preference as defined by the Bankruptcy act.
I find the facts from the testimony adduced at the final hearing to be as follows: In December of 1929 Wills borrowed from the defendant $3,500 to release a carload of automobiles which Wills had purchased and which had been forwarded with a sight draft and bill of lading attached. On November 30th, 1930, Wills borrowed an additional $3,000 from the defendant and gave his note for that sum, and on July 16th, 1931, Wills borrowed from the defendant an additional $400 and gave his note for same. These notes were renewed from time to time and were secured by capital stock of the Passaic National Bank and Trust Company and of the Atlantic City National Bank, both of which stocks were then favorably considered in the market.
It is quite apparent from the testimony that the relationship existing between Wills and the defendant was not only that of attorney and client, but that the attorney and his client were friendly and that the attorney was not only willing to but did assist his client in financial matters by the making and renewing of these loans, and it is also apparent that the attorney was careful to take what then appeared to be ample collateral to secure the advances he made to his client. The national bank holiday had not as yet been declared and the bank stock which the defendant held as collateral, *Page 297 
in so far as the public was able to observe, had a value much greater than that represented by the loans.
The defendant had represented the grandfather of Wills and had settled his estate, and had also represented Wills' mother, who had died, and he had settled her estate, so that the defendant had first-hand information as to the financial condition of Wills, in so far as that condition was the result of the settling of the two estates aforesaid, and he knew that Wills was the owner of the bank stock hereinbefore referred to and of the real estate which he had received from the estates of his grandfather and mother; in fact, the defendant had turned over to Wills all of the property of which he was possessed, both real and personal, with the exception of that which he may have accumulated outside of these sources. The defendant had appraised the real estate for the purpose of inheritance tax and the figures placed on those properties by him were rejected by the government as being too low, and while I have disagreed with his testimony as to these values and the factual question of insolvency, vel non, I have no doubt that he honestly and conscientiously believed the values that he had placed on the real estate to be the then true value, and of that value in December of 1932.
In addition to the knowledge of the defendant as to the assets of Wills, he also knew of the indebtedness of Wills to the Chelsea Second National Bank and Trust Company and to the Guarantee Trust Company, but he did not know of the indebtedness of Wills to the Atlantic City National Bank, nor of the deposit by Wills of collateral to secure that loan, which was in an amount of over $17,000, nor did he know of other indebtedness of Wills, totaling approximately an additional $15,000.
The defendant believed Wills' real estate to be worth $67,000 and his personalty, consisting of bank stock, to be worth $16,640, a total of $83,640. The defendant knew that Wills owed $35,152.62, including the indebtedness to him, the Chelsea Bank, the Guarantee Trust Company and the Hogan judgment. He did not know that in addition thereto Wills owed $32,399.36. This is, in effect, the testimony of the *Page 298 
defendant and there is nothing to controvert it, and I believe it.
The defendant admits that prior to the time when he took the mortgage he knew of a suit that had been instituted against Wills with respect to a claim for rent, and says that he was not at all perturbed by reason of that claim because he believed that Wills had a good defense thereto, nor was he disturbed by the subsequent judgment which was entered therein, because he had ample security for his loans, as he saw it, and believed that the matter would be adjusted without financial embarrassment to Wills.
Thus the situation stood as between Wills and the defendant, until shortly before the giving of the mortgage the Guarantee Trust Company instituted suit against Wills for $9,000, an indebtedness of which defendant was aware.
Prior to this time the defendant had suggested to Wills that he, Wills, together with his wife, execute a mortgage on certain of Wills' properties, as further security for defendant's loans to Wills. This suggestion was made, I think, in August preceding the giving of the mortgage in question. The giving of the suggested mortgage never took place by reason of the fact that Mrs. Wills refused to execute such an instrument. The defendant did not press the matter and says that he felt secure with the collateral he had already taken. However, when Wills presented the summons in the suit of the Guarantee Trust Company aforesaid, the defendant admits that he told Wills to go to the attorney for the Trust Company and advise them to discontinue the suit, and that if the suit was not discontinued "it would simply mean judgments against him and the bankruptcy court would necessarily follow." Defendant further says that "notwithstanding the threat of bankruptcy, he (Wills) was not insolvent at that time and there was no excuse for the attitude of the bank or the others."
There is some dispute as to just what the defendant told Wills in this respect, i.e., as to the exact instructions given by the defendant to Wills, but I have no doubt that the defendant's recollection is more to be depended upon than *Page 299 
that of his client, and while it may well be that the client did not convey to the Trust Company the exact language used by the defendant, that cannot influence my finding. It will be observed that the defendant advised his client to make the threat of bankruptcy but that the defendant's idea of the necessity for that action was not based on conditions as they were in December of 1932, but on after occurrences, i.e., the bank failures. Defendant, in this respect, says:
"Q. Isn't it a fact that if the Guarantee Trust Company had prosecuted its claim to judgment that you would have advised Mr. Wills to go into bankruptcy?
"A. I would have had my judgment first. I would have had that confessed judgment. Now then, if you insisted upon them not going along with my confessed judgment there, then, of course, bankruptcy would have followed later on and inevitable, probably, from what has transpired since; because he never could have taken care of the bank assessments which came along three or four months later, but these things were not present at the time I took my mortgage."
What the defendant meant by the confessed judgment referred to in the above-quoted testimony is apparent for, upon Wills' return from the office of the attorney for the Trust Company, there appears to have been a discussion between Wills and the defendant as to whether or not Wills should confess judgment in favor of the defendant or give a mortgage, and that Wills preferred the mortgage plan and executed the mortgage in question. Defendant says that his purpose in taking the mortgage was simply to prevent anyone obtaining a priority over his claim and that it was not his intention to create a preference, as contemplated by the Bankruptcy act, and that in his opinion, Wills was then solvent.
Was it the duty of the defendant to have made inquiry from Wills as to any other indebtedness Wills might have other than that which the defendant knew about? In answering this question, the situation must be viewed as it was at the time of the execution of the mortgage and not as it now appears in view of after happenings. If viewed from *Page 300 
the present time and the economic breakdown of the financial institutions be considered, as well as the depreciation in real estate values, there can be no doubt that the decision would be against the defendant, but when the mortgage was given the defendant was dealing not only as an attorney with Wills, but as a man who had befriended him, and before the bank crash. He says he thought he knew of the financial situation of Wills possibly as well as or better than Wills himself knew it, and that, by reason of his knowledge, he did not deem it necessary to make further inquiries. Viewed now, the defendant, as a reasonable man, should have made the inquiry, but viewed as of the time of the execution of the mortgage, and in view of the confidential relation that existed between Wills and the defendant, and viewed with the complete knowledge that the defendant thought he had of Wills' affairs, I cannot say that the mortgage should be set aside as an unlawful preference by reason of the mere fact that the defendant did not make the inquiry at the time of the execution of the mortgage. In other words, I do not find that the situation as between Wills and the defendant put the defendant, as an ordinarily prudent man, upon inquiry, other than he had made in his long course of dealings with his client. Defendant had no reason to believe that he was not fully in possession of all information as to the financial condition of his client. Again, while I have found as a fact that Wills was insolvent at the time of the giving of the mortgage to the defendant, I do not believe that Wills himself knew or thought he was in such condition. He quite naturally believed his real estate holdings to be worth the figures placed on them by the defendant ($67,000) or, having paid inheritance tax on a greater valuation, he probably considered it of greater value than his attorney had placed on it, and I am convinced that had the realtors who testified for the complainant been called to testify as to values on the day the mortgage was executed, without the picture of subsequent events before them, they would have then placed much higher values on the real estate than they did at the final hearing, having then in mind the complete collapse of financial institutions and of the real estate market. *Page 301 
Supposing the defendant had made inquiry of Wills as to his indebtedness and that Wills had told him the truth, it would have developed that Wills owed, in round figures, $67,500 and was worth, as defendant firmly believed, $83,640, not including his home, upon which no value is placed and which I believe had no value above encumbrances. Defendant knew of only $35,000 of this indebtedness and would have become aware of the balance, but still, unless I am to disbelieve that the defendant honestly thought his estimate of Wills' worth was greater, defendant would have ascertained, as a result of his inquiry, solvency, not insolvency, as the facts would have appeared to him.
I have analyzed the factual situation as I find it from the evidence and conclude that the mortgage should not be set aside under section 67-e of the Bankruptcy act of 1898, because there is no evidence that Wills intended the mortgage "to hinder, delay or defraud his creditors." Section 67-e reads as follows:
"That all conveyances, transfers, assignments, or incumbrances of his property, or any part thereof, made or given by a person adjudged a bankrupt under the provisions of this act subsequent to the passage of this act and within four months prior to the filing of the petition, with the intent and purpose on his part to hinder, delay or defraud his creditors, or any of them, shall be null and void as against the creditors of such debtor, except as to purchasers in good faith and for a present fair consideration; and all property of the debtor conveyed, transferred, assigned or encumbered as aforesaid shall, if he be adjudged a bankrupt, and the same is not exempt from execution and liability for debts by the law of his domicile be and remain a part of the assets and estate of the bankrupt and shall pass to his said trustee, whose duty it shall be to recover and reclaim the same by legal proceedings or otherwise for the benefit of the creditors. * * *."
Neither do I find from the evidence that the mortgage should be set aside under section 60-b of said act, which section reads as follows:
"If a bankrupt shall have procured or suffered a judgment to be entered against him in favor of any person or have made a transfer of any of his property, and if, at the time of the transfer, or of the entry of the judgment, or of the recording or registering of the *Page 302 
transfer if by law recording or registering thereof is required, and being within four months before the filing of the petition in bankruptcy or after the filing thereof and before the adjudication, the bankrupt be insolvent and the judgment and transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such judgment or transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person. And for the purpose of such recovery any court of bankruptcy, as hereinbefore defined, and any state court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction."
As above outlined, I find as a fact that defendant did not, at the time of the execution of the mortgage, "have reasonable cause to believe that the enforcement of the transfer would effect a preference."
It has been argued that section 60-a justifies a decree for complainant, but this argument is effectively disposed of inPirie v. Chicago Title and Trust Co., 182 U.S. 438, wherein the court said:
"Section 60 (b) is as follows:
"`If a bankrupt shall have given a preference within four months before the filing of a petition, or after the filing of the petition and before the adjudication, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee and he may recover the property or its value from such person.'
"`Subdivisions (a) and (b) are concerned with a preference given by a debtor to his creditor. Subdivision (a) defines what shall constitute it, and subdivision (b) states a consequence of it — gives a remedy against it. The former defines it to be a transfer of property which will enable him to whom the transfer is made to obtain a greater percentage of his debt than other creditors. The latter provides a consequence to be that the transfer may be avoided by the trustee and the property or its value recovered, provided, however, that the preference was given four months before the filing of the petition in bankruptcy or before the adjudication, and the creditor had reason to believe a preference was intended. So far, so clear. If the conditions mentioned exist, the preference may be avoided. But if the person receiving the preference did not have cause to believe it was intended, what then? It follows that the condition being absent, its effect will be absent. In other words, he may keep the property transferred to him, whether it be a complete or partial discharge of his debt.'" *Page 303 
The law applicable to the factual situation, as disclosed by the evidence, is laid down in a great number of federal cases, the leading case being Grant v. National Bank, 97 U.S. 80, in which the supreme court, in construing the act of 1867, held:
"* * * but he must have such knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case would render the business transactions of the community altogether too insecure."
"* * * One may be unwilling to trust the debtor further, feel anxious about his claim and have a strong desire to secure it, and yet such belief as the act requires be wanting. Obtaining additional security, or receiving payment of a debt, under such circumstances is not prohibited by the law. * * *"
"* * * That he was actually insolvent when the trust deed was executed, there is little doubt * * * there is no evidence that the officers of the bank had any knowledge of this indebtedness."
"* * * The evidence * * * only establishes the fact that the officers of the bank had reason to be suspicious of the bankrupt's insolvency, but it falls short of establishing that they had reasonable cause to believe that he was insolvent."
Grant v. Bank, supra, has been followed by all subsequent cases, among others, Barbour v. Priest, 103 U.S. 293, andStucky v. Masonic Savings Bank, 108 U.S. 74, in which theGrant v. National Bank Case was again approved, and in which the court had occasion to deal with the question of the weight to be given to the testimony of the preferred creditor, and wherein it said:
"In the case before us the testimony of Krieger (the preferred creditor) as the one who best knows the strength of the suspicion, if any, on which he acted, and what evidence was before him, must chiefly control. * * * It bears the impress of candor, and it negatives the idea that he had reasonable ground to believe bankrupt insolvent, or that he actually did believe it. *Page 304 
"The evidence, outside of this, as to the various estimates of the value of Melter's property and the amount of his debts, while it shows that Melter was probably insolvent, does not show that this was known to Melter himself, or Krieger, or that Krieger had reasonable grounds to believe him so."
I am just as strongly impressed with defendant's testimony as was the court in the above case.
Cases subsequent to the Bankruptcy act of 1867 and after the amendments of 1903 and 1910 all follow the reasoning in theGrant v. Bank Case, as will be seen by an inspection of the following cases: In re Solof, 2 Fed. Rep. 2d 130; In reKlein Moffett Co., 28 Fed. Rep. 2d 523; Heyman v. ThirdNational Bank, 216 Fed. Rep. 685; Kennard v. Behrer,270 Fed. Rep. 661, and others.
A decree dismissing the bill of complaint will be advised. *Page 305